

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**04/25/2013**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | Case No. 10-34132 |
| **Charles Phillip Cowin,** | § | |
| | § | Chapter 11 |
| **Debtor**. | § | |

| | | |
|---|---|---|
| **Countrywide Home Loans, Inc. and** | § | |
| **Deutsche Bank National Trust Company,** | § | |
| **as Trustee,** | § | Adversary No. 10-03583 |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **Chase Home Finance, LLC and Wells** | § | |
| **Fargo Bank, N.A., as Trustee,** | § | Adversary No. 10-03584 |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **WMC Mortgage Corporation,** | § | |
| **Plaintiff,** | § | Adversary No. 10-03585 |
| | § | |
| **v.** | § | |
| **Charles Phillip Cowin,** | § | |
| **Defendant.** | § | |
| | § | |

## MEMORANDUM OPINION ON NONDISCHARGEABILITY OF DEBTS PURSUANT
### TO §§ 523(a)(4) and 523(a)(6)
[relates to Adv. No. 10-03583, Doc. No. 41; Adv. No. 10-03584, Doc. No. 51; Adv. No. 10-03585, Doc. No. 58]

### I. INTRODUCTION

These adversary proceedings, which were tried simultaneously, concern the existence of

certain debts pursuant to Texas state law, and the nondischargeability of these debts under the

"larceny" and "embezzlement" exceptions of section 523(a)(4) of the Bankruptcy Code[1] and the "willful and malicious injury" exception of section 532(a)(6).[2]

Plaintiffs Countrywide Home Loans, Inc. and Deutsche Bank National Trust Company, as Trustee, Chase Home Finance, LLC and Wells Fargo Bank, N.A., as Trustee,[3] and WMC Mortgage Corporation (collectively, the Plaintiffs) allege that the Debtor, Charles Phillip Cowin (the Debtor), engaged in a conspiracy involving sections 32.06 and 32.065 of the Texas Tax Code (the Transfer Tax Lien Statutes) to defraud them of their preexisting liens on real property as well as the excess proceeds generated from foreclosure sales of those properties. The Plaintiffs assert that this scheme functioned as follows: (1) one party would purchase a property subject to a first lien mortgage held by one of the Plaintiffs at a foreclosure sale of a condominium association's assessment lien; (2) that party would then enter into a "sham" agreement with a second party for the second party to pay the *ad valorem* taxes assessed against the property in exchange for a super-priority transfer tax lien against the property; (3) the first

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

[2] The Debtor initially filed a Chapter 11 petition on May 19, 2010. [Main Case Doc. No. 1]. Eventually, this Court dismissed his Chapter 11 case with prejudice to re-filing for one year. [Main Case Doc. No. 227]. The above-referenced adversary proceedings were initiated prior to the dismissal of the main case. After the dismissal of the main case, all of the parties in the adversary proceedings agreed that they wanted this Court to finish adjudicating the lawsuits and issue a ruling. *See* [Adv. No. 10-03583, Doc. No. 33]; [Adv. No. 10-03584, Doc. No. 37]; [Adv. No. 10-03585, Doc. No. 37]. This, the Court now does. *See Querner v. Querner (In re Querner)*, 7 F.3d 1199, 1201–1202 (5th Cir. 1993) (" . . . nothing in the statute governing bankruptcy jurisdiction mandates automatic dismissal of related proceedings upon termination of the underlying bankruptcy case. The decision to retain jurisdiction over related proceedings rests within the sound discretion of the bankruptcy court.") (internal citations omitted); *Di Ferrante v. Young (In re Young)*, No. 05-94375, 2007 Bankr. LEXIS 1970, at *8 (Bankr. S.D. Tex. June 1, 2007) (same).
    Although the Debtor's Chapter 11 case was dismissed with prejudice to re-filing for one year [Main Case Doc. No. 227], on February 21, 2013 (i.e., after the one year time period passed), the Debtor subsequently filed a Chapter 7 case. *See* [Case No. 13-30984, Doc. No. 1]. This Court wants to emphasize that its ruling on nondischargeability now being rendered in these adversary proceedings, which were brought during the Debtor's former Chapter 11 case, is applicable to the Debtor's Chapter 7 case, which is currently pending.

[3] Although the caption lists "Wells Fargo Bank, N.A., as Trustee," [Adv. No. 10-03584, Doc. No. 51], the Plaintiffs have never spelled out for whom Wells Fargo is a trustee. In fact, the record reflects that Wells Fargo itself is the present owner and the holder of the note and deed of trust on the property located at 6007 Memorial Drive, Unit 404, Houston, Texas 77007 (later defined herein as "the Chase Property").

party would soon thereafter intentionally default on his obligations to repay the tax loan, resulting in the foreclosure of the transfer tax lien and sale of the property free and clear of both the tax lien and the preexisting mortgage; and (4) the first and second party would then abscond with the proceeds from the foreclosure sale.  [Adv. No. 10-03583, Doc. No. 41, p. 2]; [Adv. No. 10-03584, Doc. No. 51, p. 2]; [Adv. No. 10-03585, Doc. No. 58, p. 2].

According to the Plaintiffs, the effect of this scheme was to deprive them of both their security interests in the properties and the proceeds of the sales.  Therefore, they seek judgments in this Court declaring that:  (1) the Debtor owes each of the Plaintiffs a debt for the taking of the excess proceeds from foreclosure sales on certain properties on which the Plaintiffs held preexisting mortgage liens; and (2) the damages flowing from the takings constitute non-dischargeable debts pursuant to 11 U.S.C. §§ 523(a)(4) and/or 523(a)(6).

For his part, the Debtor admits that he had a role in the foreclosures on the properties, yet argues that his actions were entirely lawful, and that there was never a "scheme" in place to defraud the Plaintiffs of their excess proceeds.  He also contends that his companies (which took assignments of the tax liens) were simply making wise business decisions in choosing to foreclose on these properties, as opposed to acting unlawfully.  Additionally, he contends that because of the language of the Texas Property Code, he was never required to distribute the excess proceeds to the Plaintiffs.  Therefore, the Debtor contends that he does not owe a debt to any of the Plaintiffs, but that even if this Court finds that he does owe a debt to each of them, these debts are dischargeable due to the absence of any fraud or other skullduggery.

The initial trial in these adversary proceedings took place over four days:  September 13–16, 2011.  One hundred and five joint exhibits were entered into evidence.  Eight witnesses testified at the trial.  Closing arguments were made on June 1, 2012, and the Court then took the

3

matter under advisement. The matter was re-opened on June 19, 2012 to allow an additional witness, Allan Groves, to testify.[4] On August 23 and October 2, 2012, additional closing arguments were heard. The Court then took the matter under advisement.

Having now considered the testimony, the exhibits, and the applicable law, this Court concludes that the Debtor is liable to the Plaintiffs for violations of the Texas Theft Liability Act (Chapter 134 of the Texas Civil Practice & Remedies Code), Chapter 12 of the Texas Civil Practice & Remedies Code, and the Texas Uniform Fraudulent Transfer Act (Section 24.001 *et. seq.* of the Texas Business & Commerce Code). Further, this Court concludes that these debts were incurred by the Debtor's larceny and also arose through willful and malicious injury by the Debtor; and that, therefore, these debts are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9014 and Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.[5]

## II. FINDINGS OF FACT

**Parties and Entities Involved**

1) The Plaintiffs in these adversary proceedings are: (1) Countrywide Home Loans, Inc. (Countrywide) and Deutsche Bank National Trust Company (Deutsche Bank), as Trustee under the Pooling and Servicing Agreement Relating to IMPAC Secured Assets Corp, Mortgage Pass-Through Certificates, Series 2006-4 (IMPAC) [Adv. No. 10-03583]; (2)

---

[4] Allan Groves initially refused to take the oath, and this Court therefore held him in contempt and put him in custody until he agreed to take the oath. [Adv. No. 10-03584, Doc. No. 41]. Subsequently, he agreed to take the oath, at which point this Court held that he was no longer in contempt. Once he took the oath, he was on the stand for nearly two hours, but asserted his Fifth Amendment rights on most of the questions posed to him.

[5] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

Chase Home Finance, LLC (Chase) and Wells Fargo Bank, N.A. (Wells Fargo), as Trustee [Adv. No. 10-03584]; and (3) WMC Mortgage Corporation (WMC) [Adv. No. 10-03585]. At the request of the parties, this Court consolidated these three suits for trial purposes on September 13, 2011. *See* [Adv. No. 10-03583, Doc. No. 20]; [Adv. No. 10-03584, Doc. No. 21]; [Adv. No. 10-03585, Doc. No. 21].

2) Plaintiffs are the mortgage holders, trustees, and/or servicers for three mortgage loans: (1) the Countrywide loan, which was secured by a lien against the property located at Tremont Tower, 3311 Yupon St., Unit 307, Houston, Texas 77006 (the Countrywide Property) [Ex. No. 86]; (2) the WMC loan, which was secured by a lien against the property located at 3231 Allan Parkway, Unit 6306, Houston, Texas 77019 (the WMC Property) [Ex. No. 70]; and (3) the Chase loan, which was secured by a lien against the property located at Memorial Cove Lofts, 6007 Memorial Drive, Unit 404, Houston, Texas 77007 (the Chase Property). [Ex. No. 45]. The Countrywide Property, the WMC Property, and the Chase Property are all located in Harris County, Texas.

3) The Debtor holds a Masters Degree in Business from the University of Chicago. [Sept. 15, 2011 Tr. 68:2–6]. He worked at Exxon for over 29 years, most recently as "new venture operations manager," until his retirement in 2006. [*Id.* at 67:15–68:1]. While employed at Exxon, the Debtor engaged in making tax transfer loans in his own name. [*Id.* at 69:23–70:3]. After he retired, the Debtor continued to make tax transfer loans; however, he stopped doing so in his own name and, instead, made tax loans under LLCs which he established for that purpose. [*Id.* at 68:7–14].

4) Allan Groves is a personal friend of the Debtor [Doc. No. 14-5, ¶ 24]; [Sept. 15, 2011 Tr. 75:17–22] and is the ex-husband of Nancy Groves. [Doc. No. 14-5, ¶ 25]. Allan Groves,

acting by and through his companies, was involved in purchasing a number of properties upon foreclosure of condominium association assessment liens, encumbering those properties with transfer tax liens, and allowing those liens to be foreclosed.

5) Nancy Groves is a retired real estate investor [Sept. 14, 2011 Tr. 185:17–22] and is the ex-wife of Allan Groves [*Id.* at 186:7–187:1]. Nancy Groves was involved in purchasing a number of properties upon foreclosure of condominium association assessment liens, encumbering those properties with transfer tax liens [*Id.* at 202:10–15; 205:21–24], and allowing those liens to be foreclosed. *See, e.g.*, [Sept. 15, 2011 Tr. 30:11–31:18].

6) G.P. Matherne (Matherne) is an attorney [Sept. 13, 2011 Tr. 93:2–11] and long time friend of Allan Groves. [*Id.* at 138:14–17]. Pursuant to an agreement with the Debtor, Matherne was named as trustee in all of the Deeds of Trust associated with the transfer tax loans granted by Woodway Campton, Ltd. and Dampkring, LLC.[6] [*Id.* at 100:7–24].

7) Perc, LLC (Perc) and Texas Realty Holdings, LLC (TRH) are Nevada limited liability companies controlled by Allan Groves. Allan Groves hired Lance Kerness (Kerness) and paid him a fee to serve as managing member for both of these entities.[7] [Sept. 14, 2011 Tr. 40:1–14; 57:9–23; 58:17–24]. There were no other employees, officers, managers, or directors of either entity [*Id.* at 38:20–39:25], and Allan Groves was the only person who Kerness could identify as having any affiliation with either Perc or TRH. [*Id.* at 41:2–14]. Kerness himself had very little knowledge of the day-to-day business of Perc and TRH, *see, e.g.*, [*Id.* at 48:19–21; 49:2–9; 49:25–50:9; 50:22–24; 51:4–9], and had no actual authority or

---

[6] These two entities, which were effectively under the Debtor's control, are more specifically described in Finding of Fact Nos. 8 & 9.

[7] In fact, Kerness makes a living by hiring himself out to serve as a manager of LLCs or director or officer of corporations. [Sept. 14, 2011 Tr. 42:7–10]. Kerness estimated that at one time, he acted as a figurehead or manager for three to four thousand companies. [*Id.* at 95:25–96:3].

control over either entity; he performed only ministerial tasks such as signing documents, making bank withdrawals, and sending out mail, but only at the instruction of Allan Groves. [*Id.* at 41:2–5; 51:16–52:1; 52:20–21; 54:9–15; 54:22–24; 58:25–59:15].  For these reasons, the Court finds that Kerness was simply the pawn through which Allan Groves controlled Perc and TRH.  This arrangement was designed so that Allan Groves' name would not appear on any records associated with either business.  [*Id.* at 40:1–25; 65:10–16; 96:9–97:7].

8)  Woodway Campton, Ltd. (WCL) is a Texas real estate company owned and controlled by the Debtor.  WCL has two shareholders—the Debtor and Woodway Campton GP, Inc.  [Sept. 15, 2011 Tr. 81:5–15]; [Adv. No. 10-03583, Doc. No. 11, ¶¶ 6 & 7].  The Debtor is the only shareholder of Woodway Campton GP, Inc. Sept. 15, 2011 Tr. 81:16–21]; [Adv. No. 10-03583, Doc. No. 11, ¶ 8].  From approximately April 25, 2007 through May 10, 2007, WCL was engaged in the business of making tax transfer loans, ultimately making at least eleven of these loans.  [Sept. 15, 2011 Tr. 84:11–85:16]; [Adv. No. 10-03583, Doc. No. 11, ¶¶ 9 & 10]; *see also* [Ex. Nos. 21–31].  Of these eleven loans, seven involved foreclosures.  [Ex. Nos. 32, 34, 36, 38, 40, 42 & 44].

9)  Dampkring, LLC (Dampkring) is a Texas company [Ex. No. 50] controlled by the Debtor.[8]  The sole member and manager of Dampkring is Brien West (West) [*Id.*], who is a childhood friend of the Debtor's son, Robert P. Cowin.  [Sept. 14, 2011 Tr. 108:1–9].  For $500.00 per month, Robert P. Cowin persuaded West to establish Dampkring and assume a "figurehead" role; West knew that the Debtor and Robert P. Cowin would actually run the company's business.  *See* [*Id.* at 109:19–25] ("Q: . . . how were you going to run this new business?  A: My understanding was I didn't really have to do all that much.  Q:  What role were you going to have in the day-to-day operations of Dampkring?  A:  Really, next to none.").  West

---

[8] *See* Finding of Fact No. 34 for a discussion of this Court's finding that the Debtor controlled Dampkring.

performed ministerial tasks such as opening a bank account and signing checks and other documents, but did so only at the direction of Robert P. Cowin. [*Id.* at 110:1–9]. Dampkring was engaged in the business of making tax transfer loans from June 25, 2007 to August 27, 2007, and during this time made at least fifteen of these loans. [Ex. Nos. 52–66]. Dampkring remained active until October 5, 2007 in order to foreclose on properties on which it held tax transfer liens; in total, eleven of the fifteen loans it made involved foreclosures. [Ex. Nos. 67, 69, 71, 73, 75, 77, 79, 81 & 87].

10) Terra Development is owned and controlled by Robert Morrow (Morrow). [Sept. 16, 2011 Tr. 83:6–19]. Morrow is a business associate of the Debtor. [*Id.* at 83:10–13]. Some of the tax loans granted by WCL and Dampkring were later assigned to Terra Development. [*Id.* at 83:20–84:5; 86:8–24].

**Tax Transfer Liens**

11) In Texas, on January 1 of each year, a tax lien in favor of each taxing unit having power to impose property taxes attaches to real property to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property. TEX. TAX CODE §32.01; *Avelo Mortg., LLC v. Infinity Capital, LLC*, 366 S.W.3d 258, 261–62 (Tex. App. 2012). Tax liens on real property take priority over nearly every other lien or claim against property, including purchase money mortgages. TEX. TAX CODE § 32.05. Therefore, when a tax lien is foreclosed, any subordinate liens are stripped. *Conversion Properties, L.L.C. v. Kessler*, 994 S.W.2d 810, 813 (Tex. App. 1999).

12) Pursuant to the Texas Transfer Tax Lien Statutes, a property owner may authorize another person to pay any delinquent taxes on his behalf. *See* TEX. TAX CODE §§ 32.06, 32.065; *Avelo Mortg., LLC*, 366 S.W.3d at 262. The Transfer Tax Lien Statutes permit the lender

and the property owner to enter into a private contract containing the terms for repayment of the tax loan and securing the loan with a deed of trust (i.e., a contractual lien) against the real property. *See* TEX. TAX CODE § 32.065(a). This sort of contract permits: (1) nonjudicial foreclosure of the deed of trust, TEX. TAX CODE § 32.06(c); and (2) foreclosure to be instituted within one year from the date the transfer tax lien is recorded, if the parties so agree. TEX. TAX CODE § 32.06(i).

**The Countrywide Property**

13) On September 7, 2006, Erne Jackson borrowed $638,350.00 from American Brokers Conduit (ABC) to purchase the Countrywide Property. [Ex. No. 99]. A deed of trust granting a first lien mortgage security interest on the Countrywide Property in favor of Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for ABC, in the amount of $510,680.00 was executed on September 8, 2006 and recorded on October 14, 2006 in the real property records of Harris County, Texas. [Sept. 13, 2011 Tr. 44:5–46:4]; [Ex. No. 86].

14) IMPAC thereafter acquired all right, title, and interest in the note and the deed of trust, and authorized Deutsche Bank to serve as trustee and Countrywide to act as its mortgage servicer. [Sept. 13, 2011 Tr. 46:10–47:8]. This transaction was recorded with MERS[9] [*Id.* at 53:25–54:18; 56:18–22], but was not recorded in the real property records of Harris County, Texas. [*Id.* at 72:21–23]. In 2008, Bank of America purchased Countrywide and took over its function as mortgage servicer. [*Id.* at 46:19–24].

15) On August 7, 2007, TRH (controlled by Allan Groves) purchased the Countrywide Property from the Tremont Tower Condominium Association via foreclosure sale based on the non-

---

[9] MERS is a private corporation set up for the purpose, among other purposes, of tracking assignments electronically. [Sept. 13, 2011 Tr. at 74:10–20].

payment of condominium association fees.  TRH took title to the Countrywide Property subject to IMPAC's preexisting mortgage lien.

16) On August 23, 2007, TRH borrowed $15,568.75 from Dampkring (controlled by the Debtor) to pay taxes assessed against the Countrywide Property by Harris County, Harris County Hospital District, Harris County Flood Control District, Harris County Department of Education, Port of Houston Authority, City of Houston, Houston Community College System, and Houston ISD (collectively, the Taxing Units).  In exchange, TRH executed an Agreement for Ad Valorem Tax Transfer promising to repay the original principal amount of $15,568.75, plus $750.00 in "transfer costs and attorneys' fees" to Dampkring and a deed of trust on the Countrywide Property in favor of Dampkring securing repayment of these amounts (the Countrywide Tax Transfer DOT).  Pursuant to the agreement between TRH and Dampkring, TRH was required to pay the $750.00 by September 5, 2007—just thirteen days following the execution of the Countrywide Tax Transfer DOT.  However, TRH never paid the $750.00 or any part of the $15,568.75 it owed to Dampkring.  [Sept. 14, 2011 Tr. 51:10–12].

17) Dampkring thereafter transferred the Countrywide Tax Transfer DOT to Terra Development (controlled by the Debtor's business associate, Robert Morrow).  Sometime prior to December 4, 2007, the Debtor called Matherne (i.e., the Trustee) and instructed him to foreclose on the Countrywide Property under the Countrywide Tax Transfer DOT.[10]

---

[10] Matherne had initially testified that the Debtor called him to foreclose on behalf of Terra Development and Dampkring [Sept. 13, 2011 Tr. 115:24–116:4; 148:25–154:20], but at trial testified that he was not sure that it was the Debtor who had called him to foreclose.  [*Id.* at 114:14–24; 154:16–20].  For the reasons discussed in the Credibility section, *see infra* section III(c), the Court finds that it was, in fact, the Debtor who called Matherne to instruct him to foreclose on the Countrywide Tax Transfer DOT, which had been transferred from Dampkring to Terra Development.

18) On December 4, 2007 the Countrywide Property was sold via foreclosure sale to Infinity Capital, LLC for $118,000.00.  This sale stripped IMPAC of its lien on the Countrywide Property.  Matherne received $1,000.00 from the proceeds of the sale, representing his Trustee's fee, and paid the full amount due under the Countrywide Tax Transfer DOT (i.e., the principal amount plus interest, costs, and fees) to Terra Development.[11]  Pursuant to the language in the Countrywide Tax Transfer DOT, Matherne paid all of the excess proceeds— which amounted to $99,927.13—to TRH (controlled by Allan Groves).  [Ex. No. 85 for Trustee's Deed; Ex. No. 89 for Checks, Check No. 546]; [Sept. 13, 2011 Tr. 144:7–18].  Countrywide received nothing to pay down the preexisting mortgage lien it was servicing for IMPAC.

**The WMC Property**

19) On October 20, 2006, Matthew Parker borrowed $232,000.00 from WMC to purchase the WMC Property.  A deed of trust granting a first lien mortgage security interest on the WMC Property in favor of MERS, as nominee for WMC, in the amount of $185,600.00 was executed on October 20, 2006 and recorded on November 1, 2006 in the real property records of Harris County, Texas.  [Sept. 13, 2011 Tr. 44:5–46:4]; [Ex. No. 99].  MERS ceased acting as WMC's nominee on June 18, 2007.

20) On June 5, 2007, TRH (controlled by Allan Groves) purchased the WMC Property from the Reata at River Oaks Condominium Association, Inc. via foreclosure sale based on the non-payment of condominium association fees.  TRH took title to the WMC Property subject to WMC's preexisting mortgage lien.

---

[11] Matherne knew how much was owed to Terra Development under the Countrywide Tax Transfer DOT because, as was their common practice, the Debtor faxed him a payoff statement.  [Sept. 13, 2011 Tr. 140:3–142:14].

21) On June 25, 2007, TRH borrowed $6,546.20 from Dampkring (controlled by the Debtor) to pay taxes assessed against the WMC Property by the Taxing Units.  [Ex. No. 56].  In exchange, TRH executed an Agreement for Ad Valorem Tax Transfer promising to repay the original principal amount of $6,546.20, plus $750.00 in "transfer costs and attorneys' fees" to Dampkring and a deed of trust on the WMC Property in favor of Dampkring securing repayment of these amounts (the WMC Tax Transfer DOT).  [Ex. No. 64].  Pursuant to the agreement between TRH and Dampkring, TRH was required to pay the $750.00 by July 5, 2007—just ten days following the execution of the WMC Tax Transfer DOT.  However, TRH never paid the $750.00, or any part of the $6,546.20 it owed to Dampkring.  [Sept. 14, 2011 Tr. 51:10–12].

22) Sometime prior to October 5, 2007, the Debtor called Matherne[12] (i.e., the Trustee) to instruct him to foreclose on the WMC Property under the WMC Tax Transfer DOT.

23) On October 5, 2007, the WMC Property was sold via foreclosure sale to Abe Ham Moss for $67,000.00.  Matherne received his Trustee's fee of $1,000.00 and paid the full amount due under the tax transfer lien (i.e., the principal amount plus interests, costs, and fees) to Dampkring.[13]  Pursuant to the language in the WMC Tax Transfer DOT, Matherne paid all of the excess proceeds—which amounted to $58,300.86—to TRH (controlled by Allan Groves). [Ex. No. 69 for Trustee's Deed; Ex. No. 89 for Checks; Ex. No. 95 for payoff statement]. WMC received nothing to pay down its preexisting mortgage lien.

**The Chase Property**

---

[12] Matherne had initially testified that the Debtor called him to foreclose on behalf of Terra Development and Dampkring [Sept. 13, 2011 Tr. 115:24–116:4; 148:25–154:20], but at trial testified that he was not sure that it was the Debtor who had called him to foreclose.  [*Id.* at 114:14–24; 154:16–20].  For the reasons discussed in the Credibility section, *see infra* section III(c), the Court finds that it was, in fact, the Debtor who called Matherne to instruct him to foreclose on the WMC Tax Transfer DOT, which was held by Dampkring.

[13] Matherne knew how much was owed to Dampkring under the WMC Tax Transfer DOT because, as was their common practice, the Debtor faxed him a payoff statement.  *See* [Ex. No. 95]; [Sept. 13, 2011 Tr. 140:3–142:14].

24) On October 10, 2005, Edward Ace Montez borrowed $570,000.00 from WMC to purchase the Chase Property.  [Ex. No. 100].  A deed of trust granting a first lien mortgage security interest on the Chase Property in favor of MERS, as nominee for WMC, to secure repayment of an adjustable rate note in the original principal amount of $456,000.00, plus interest, was executed on October 10, 2005 and recorded on October 14, 2005 in the real property records of Harris County, Texas.  [Sept. 13, 2011 Tr. 44:5–46:4; 63:19–64:5; 66:18–67:7]; [Ex. No. 45].  Wells Fargo thereafter acquired all right, title and interest in the loan and, at all times relevant, was a mortgagee of the loan and authorized Chase to act as its mortgage servicer.  [Sept. 13, 2011 Tr. 63:1–4; 64:7–9].  The assignment of the note to Wells Fargo was recorded with MERS[14] [*Id.* at 72:4–11], but was not recorded in the real property records of Harris County, Texas.  [*Id.* at 72:21–23].

25) On May 3, 2007, Nancy Groves purchased the Chase Property from the Memorial Lofts Homeowners Association via foreclosure sale based on the non-payment of condominium association fees.  Nancy Groves took title to the Chase Property subject to Wells Fargo's preexisting mortgage lien.  [Sept. 14, 2011 Tr. 203:2–25].

26) On May 10, 2007, Nancy Groves borrowed $40,311.09 from WCL (controlled by the Debtor) to pay taxes assessed against the Chase Property by the Taxing Units.  In exchange, Nancy Groves executed an Agreement for Ad Valorem Tax Transfer promising to repay the original principal amount of $40,311.09 plus $750.00 in "transfer costs and attorneys' fees" to WCL and a deed of trust on the Chase Property in favor of WCL securing repayment of these amounts (the Chase Tax Transfer DOT).  [Ex. No. 30].  Pursuant to the agreement between Nancy Groves and WCL, Nancy Groves was required to pay the $750.00 by May

---

[14] *See* footnote nine.

20, 2007—just ten days following the execution of the Chase Tax Transfer DOT.  However, Nancy Groves never paid the $750.00, or any part of the $39,728.09 she owed to WCL. [Sept. 14, 2011 Tr. 208:13–20].

27) Sometime prior to September 4, 2007, the Debtor called Matherne (i.e., the Trustee) to instruct him to foreclose on the Chase Property under the Chase Tax Transfer DOT.

28) On August 14, 2007, Nancy Groves sold the Chase Property to Perc (controlled by her ex-husband, Allan Groves) for the amount that she originally paid for it.  [Sept. 14, 2011 Tr. 214:15–17; 215:9–16; 216:11–16].

29) On September 4, 2007, the Chase Property was sold at foreclosure sale to HS Tejas, Ltd. for $162,500.00.  This sale stripped Wells Fargo of its lien on the Chase Property.  Matherne received $1,000.00 from the proceeds of the sale, representing his Trustee's fee, and paid the full amount due under the tax transfer lien (i.e., the principal amount plus interests, costs, and fees) to WCL.[15]  Pursuant to the language in the Chase Tax Transfer DOT, Matherne paid all of the excess proceeds—which amounted to $118,261.01—to Perc (controlled by Allan Groves).  [Ex. No. 44 for Trustee's Deed; Ex. No. 47 for Checks; Ex. No. 94 for payoff statement].  Wells Fargo received nothing to pay down its preexisting mortgage lien.

**The Scheme**

30) The scheme involved a purchaser/borrower, a lender, and the Trustee.  The purchaser/borrower purchased properties (subject to first lien mortgages held by the Plaintiffs) at foreclosure sales of condominium association assessment liens.  Very shortly after acquiring the properties (here, between seven and twenty days), the purchaser/borrower contracted with a private lender to borrow funds for the purpose of paying real property taxes

---

[15] Matherne knew how much was owed to Dampkring under the WMC Tax Transfer DOT because, as was their common practice, the Debtor faxed him a payoff statement.  [Sept. 13, 2011 Tr. 140:3–142:14].

assessed against the properties.  In exchange, the purchaser/borrower executed deeds of trust granting the private lenders tax transfer liens against the properties.  The purchaser/borrower almost immediately defaulted on the payment obligations to these private lenders, and the Debtor, on behalf of the private lenders, thereafter called the Trustee and instructed him to foreclose on the properties.  Out of the proceeds from the foreclosure sales, the Trustee took his $1,000.00 fee, the private lenders' tax transfer liens were paid in full, and the remaining proceeds were delivered to entities controlled by the members of the scheme.  At issue in the dispute at bar are three specific instances in which this scheme was carried out.  However, the Plaintiffs presented evidence that the Debtor and his co-conspirators engaged in this same pattern of behavior on numerous occasions.

31) Nancy Groves and Allan Groves participated in the scheme as purchasers.  Nancy Groves purchased the Chase Property at a foreclosure sale of the Memorial Lofts Homeowners Association's assessment lien.  TRH (controlled by Allan Groves) purchased the Countrywide Property and the WMC Property at foreclosure sales of condominium association assessment liens.  Allan Groves was involved in the purchases of all three of these properties (i.e., the Chase Property, the Countrywide Property, and the WMC Property) by and through:  (1) TRH; and (2) his ex-wife, Nancy Groves.  [Ex. No. 51]; [Sept. 14, 2011 Tr. 95:25– 96:3].  For example, Kerness, the individual who Allan Groves hired to be the "figurehead" managing member of both Perc and TRH, testified that he would occasionally travel to Houston to purchase properties at foreclosure sales on behalf of Perc or TRH.  [Sept. 14, 2011 Tr. 95:12–23; 98:6–24; 99:5–7].  Allan Groves provided Kerness with instructions as to what properties to purchase, provided cash to make the purchases [*Id.* at 99:18–100:4], and was often present at the sales.  [*Id.* at 101:1–10].  Additionally, Allan Groves assisted

Nancy Groves in purchasing properties, including the Chase Property, at foreclosure sales of condominium association assessment liens by locating and researching properties for her to purchase. [*Id.* at 218:10–21]. At the time of these purchases, both Allan Groves and Nancy Groves were aware that the properties were encumbered with pre-existing mortgage liens.

32) Further, Allan Groves and Nancy Groves participated in the scheme as borrowers by impressing tax liens against the properties to secure loans they never intended to repay. Seven days after purchasing the Chase Property, Nancy Groves impressed a tax transfer lien upon it in favor of WCL (controlled by the Debtor). [Ex. No. 30]. Allan Groves helped her obtain this loan by contacting the Debtor on her behalf, bringing the loan documents to her, and returning them to the Debtor after she had executed them. [Sept. 14, 2011 Tr. 204:10–205:2; 205:18–24; 206:7–19]. Nancy Groves did not even read the loan documents that she executed in connection with the tax transfer lien on the Chase Property [*Id.* at 208:8–10], and intentionally defaulted without ever having made a payment on this loan. [*Id.* at 208:13–20; 209:11–16]. Similarly, TRH (controlled by Allan Groves) impressed tax transfer liens on the WMC Property and the Countrywide Property in favor of Dampkring (controlled by the Debtor) just twenty days and sixteen days, respectively, after purchasing these properties. [Ex. Nos. 64 & 56]. Allan Groves never instructed Kerness (i.e., the nominal head of TRH) to repay any tax transfer loans taken out by TRH. [Sept. 14, 2011 Tr. 51:13–52:5].

33) The Debtor, using two entities he controlled (i.e., WCL and Dampkring), participated in the scheme as a lender. From 2004 through 2006, the Debtor made nineteen tax transfer loans in his own name. [Adv. No. 10-03583, Doc. No. 11, ¶1]. The deeds of trust for the loans made in the Debtor's own individual name (the Cowin Deeds of Trust) provide for the excess proceeds to be disbursed as follows in the event of a foreclosure sale:

> (a) expenses of foreclosure, including a commission to Trustee of 5% of the bid;
> (b) to Beneficiary, the full amount of principal, interest, attorneys' fees, and other
> charges due and unpaid; (c) ***any amounts required by law to be paid before
> payment to Grantor***; and (d) to Grantor, any balance.

[Ex. Nos. 1–19] (emphasis added).  Whenever the Debtor foreclosed pursuant to the Cowin

Deeds of Trust, the excess proceeds were paid to the preexisting lienholders.  After 2006, the

Debtor changed tactics.  Rather than making tax transfer loans in his own name, he made

them through either WCL or Dampkring, both entities that he controlled.[16]  The form of deed

of trust used by WCL and Dampkring to make the tax transfer loans was substantially the

same form as the Cowin Deeds of Trust.[17]  However, the Debtor changed the language in the

WCL and Dampkring Deeds of Trust (the WCL and Dampkring Deeds of Trust) to provide

for a different order of payment after a foreclosure sale as follows:

> (a) expenses of foreclosure, including a commission to Trustee of 5% of the bid;
> (b) to Beneficiary, the full amount of principal, interest, attorneys' fees, and other
> charges due and unpaid; (c) to Grantor, any balance.

 [Ex. Nos. 21–31 & 52–66].  Thus, the WCL and Dampkring Deeds of Trust omit the

direction to disburse "*any amounts required by law to be paid before payment to Grantor*,"

which would direct payment to preexisting lienholders such as the Plaintiffs.  The Court finds

that the Debtor was responsible for preparing the WCL and Dampkring Deeds of Trust.

Further, the Court finds that the Debtor intentionally omitted this language (i.e., the

instruction to pay "any amounts required by law to be paid before payment to Grantor") from

the WCL and Dampkring Deeds of Trust.  The Debtor did so as a way to divert the excess

proceeds from the foreclosure sales away from the Plaintiffs, who were the rightful

---

[16] *See* Finding of Fact No. 34 for a discussion of this Court's finding that the Debtor controlled Dampkring.

[17] The Debtor admits that the form of deed of trust used by WCL was substantially the same as the one used by the
Debtor to make loans in his own name.  [Adv. No. 10-03583, Doc. No. 11, ¶ 14].  Further, the Court notes that the
form of deed of trust used by Dampkring was substantially the same as the one used by the Debtor to make loans in
his own name.  *Compare* [Ex. Nos. 1–19] *with* [Ex. Nos. 52–66].

recipients, and instead ensure that the proceeds were deposited with entities controlled by Allan Groves.

34) The Court finds that Dampkring was actually controlled by the Debtor. The Debtor merely used his son, Robert P. Cowin, as a conduit through which he could control West and Dampkring. The Court makes this finding for a number of reasons. Dampkring was established to make tax loans, just as WCL had done, yet neither West nor Robert P. Cowin had much experience in this area. [Sept 14, 2011 Tr. 106:19–107:2]; [Sept. 15, 2011 Tr. 38:11–39:3]. As discussed above in Finding of Fact No. 9, West was approached by Robert P. Cowin to establish Dampkring, and was not involved in the day-to-day operations of the business. Robert P. Cowin testified that Dampkring was neither his nor West's idea [Sept. 15, 2011 Tr. 43:4–13], and he could not recall his own level of involvement in Dampkring or whether he had participated in establishing Dampkring.[18] [*Id.* at 43:24–44:10]. In fact, Robert P. Cowin testified that he did not know where the money came from to start Dampkring. [*Id.* at 54:24–25]. Neither Robert P. Cowin nor West knew Nancy Groves or TRH (controlled by Allan Groves), who were Dampkring's only borrowers. [Sept. 14, 2011 Tr. 122:15–123:6; 115:22–116:11]; [Sept. 15, 2011 Tr. 39:4–23]. Nor did either of them know Matherne, who was named as trustee in all of the Dampkring Deeds of Trust. [Sept. 14, 2011 Tr. 125:19–126:22]; [Sept. 15, 2011 Tr. 41:12–14]. Taken as a whole, these facts demonstrate that the Debtor was actually the one in control of Dampkring.

35) With respect to the loan made to Nancy Groves for the taxes on the Chase Property, the Debtor only communicated with Allan Groves in connection with making that loan. [Sept.

---

[18] West testified that, based on his observation of the Debtor and Robert P. Cowin, the Debtor was the "dominant person in the business relationship" and that Robert P. Cowin worked for his father (i.e., the Debtor). [Sept. 14, 2011 Tr. 142: 2 – 8]. For reasons discussed in the Credibility section of this Opinion, *infra* section III(e), the Court finds this testimony to be very credible.

15, 2011 Tr. 89:15–20].  Nancy Groves did not submit a loan application [*Id.* at 88:5–7], and WCL did not request any financial documents from her prior to extending the loan. [*Id.* at 88:23–25].  Similarly, with respect to the loans made to TRH for the taxes on the WMC Property and the Countrywide Property, there was no underwriting process involved to determine creditworthiness or ability to repay.   [*Id.* at 96:22–97:20].

36) Matherne participated in the scheme as the Trustee.  Matherne was named Trustee for *all* the WCL and Dampkring Tax Transfer Lien documents.   [Sept. 14, 2011 Tr. 100:7–24].  Prompted by either a phone call or voicemail from the Debtor instructing him to obtain a title report and foreclose on a property when the tax lien loan associated therewith was in default, Matherne would do so.[19]  [Sept. 13, 2011 Tr. 106:1–21; 131:3–137:8].  Matherne testified that the purpose of the title report was to determine who the lender was for the preexisting mortgage.  [*Id.* at 101:16–25].  Thus, the Court concludes that both the Debtor and Matherne knew that the Chase Property, the WMC Property, and the Countrywide Property were encumbered with preexisting mortgages.  After foreclosing on a property, Matherne first deducted his $1,000.00 Trustee's fee from the proceeds of the sale.  [*Id.* at 117:24–118:1].  Then, Matherne paid the full amount due to the co-conspiring lender holding the tax lien, plus any interest, attorneys' fees, and other charges.  Finally, instead of paying the remaining excess proceeds to the Plaintiffs (the preexisting lienholders), Matherne distributed the excess proceeds to Perc or TRH (both controlled by Allan Groves). [Sept. 14, 2011 Tr. 123:10–13; 124:4–11; 142:21–144:6; 49:8–12; 106:9–106:23]; [Ex. Nos. 47 & 89 for checks].  Matherne testified that he did not pay the excess proceeds to the Plaintiffs because

---

[19] Although the Debtor has attempted to deny his involvement with Dampkring, Matherne testified that it was the Debtor who called upon him to foreclose under the Dampkring Deeds of Trust.  [Sept. 13, 2011 Tr. 150:18–151:3]. Although neither the Debtor nor Matherne are particularly credible witnesses, *see infra*  Section III, on this point, the Court finds Matherne to be more credible and therefore finds that the Debtor did, in fact, give instructions to Matherne by a phone call or voice mail to obtain title reports and foreclose on properties.

he was following:  (1) the instructions listed in the WCL and Dampkring Deeds of Trust; and (2) the oral instructions given to him by the Debtor to follow the language in the WCL and Dampkring Deeds of Trust. [Sept. 14, 2011 Tr. 124:9–11; 146:14–19; 166:5–7].  Matherne testified that the Debtor led him to believe that Perc and TRH would hold the excess proceeds until a claim was made against the funds.  [Sept. 13, 2011 Tr. 123:7–15; 124:8–11; 146:14–147:6].

37) Kerness managed the bank accounts for both TRH and Perc.  [Sept. 14, 2011 Tr. 51:16–18]. Kerness testified that money was deposited into these accounts, but that he did not know the source of the funds.  [*Id.* at 53:9–25].   Additionally, Kerness testified that he could not simply disburse the funds as he saw fit.   [*Id.* at 51:16–20].  Rather, Kerness would disburse the funds according to Allan Groves' instructions.  [*Id.* at 51:21–52:1].  Kerness estimated that, at Allan Groves' direction, he delivered half a million dollars to Allan Groves [*Id.* at 56:3–11] and tens of thousands of dollars to Nancy Groves [*Id.* at 56:12–18] in the form of cash, cashier's checks, or money orders.[20]  [*Id.* at 54:14–55:24].  These transactions between Kerness and Allan Groves and Nancy Groves constitute the last known accounting for the excess proceeds generated from the foreclosure sales.

### III. CREDIBILITY OF WITNESSES

The following witnesses testified:

    (a) **Lisa Alvarez** – Lisa Alvarez is a litigation specialist for Bank of America who is familiar with the loan files for the loan on the Countrywide Property.  [Sept. 13, 2011 Tr. 44:8–

---

[20] Meanwhile, the Plaintiffs have alleged that the scheme was carried out "at least 18 times (and attempted at least a dozen times more) resulting in the elimination of just as many pre-existing mortgage liens and the theft of more than $1.44 million dollars in excess proceeds belonging to pre-existing lienholders."  [Adv. No. 10-03583, Doc. No. 35, p. 5].  In the disputes at bar, it is not necessary for this Court to determine exactly how much in total excess proceeds were taken as a result of the conspiracy because it is clear to this Court from the record here how much was taken from these particular Plaintiffs.

14].  She testified that Deutsche Bank is the current trustee for the owner of the note, and that the owner is IMPAC.  [*Id.* at 46:2–15].  Countrywide is the mortgage servicer, and Bank of America purchased Countrywide in 2008.  [*Id.* at 46:19–24].  The Court finds that Ms. Alvarez is a credible witness and gives substantial weight to her testimony.

(b)  **Albert Smith, Jr**. – Albert Smith, Jr. is a home lending research officer for JPMorgan Chase Bank, N.A. [*Id.* at 61:25–62:7] who is familiar with the loan files for the Chase Property. [*Id.* at 62:6–11; 63:11–18].  He testified that Wells Fargo is the current owner of the note [*Id.* at 67:8–17], and that Chase is its mortgage servicer.  [*Id.* at 63:1–4; 64:7–9].  The Court finds that Mr. Smith is a credible witness and gives substantial weight to his testimony.

(c)  **G.P. Matherne (Matherne)** - The Court finds that Matherne is, for the most part, not a credible witness and, therefore, gives little weight to his testimony.  Matherne's testimony at trial reveals his attempts: (1) to protect his co-conspirators by feigning ignorance; and (2) to skirt responsibility for failing to distribute the excess proceeds as required by Texas law by claiming he was merely following instructions in the WCL and Dampkring Deeds of Trust.  The following exchanges serve as examples of his questionable credibility.

Matherne had previously testified—unequivocally and under oath—that whenever he was called upon to foreclose a WCL, Dampkring, or Terra Development Deed of Trust, the Debtor was always the one who telephoned him.  [*Id.* at 148:25–154:20].  During trial, however, Matherne testified that he did not know if the Debtor was the one who called him to foreclose; rather, Matherne testified at trial that he had merely assumed that the voice on the phone was that of the Debtor.  [*Id.* at 154:16–20].  When prompted

to explain the reason why he changed his testimony, Matherne testified that the Debtor had approached him and told him that it was not him (i.e., the Debtor) on the phone. [*Id.* at 155:7–10]. However, Matherne admitted that he knew of no other person associated with WCL, Dampkring, or Terra Development who would have called him. [*Id.* at 155:4–6]. The Court concludes that it was, in fact, the Debtor who called Matherne to foreclose on the Countrywide Property, the WMC Property, and the Chase Property under the Countrywide Tax Transfer DOT, the WMC Tax Transfer DOT, and the Chase Tax Transfer DOT (collectively, the Tax Transfer Deeds of Trust)—regardless of whether the Tax Transfer Deeds of Trust were held by WCL, Dampkring, or Terra Development. Further, the Court finds it implausible that Matherne would take directions from a random stranger to foreclose under a deed of trust for which he served as Trustee, and therefore finds that Matherne knew that it was the Debtor who had called him. Even if the Debtor did not specifically identify himself on the phone, Matherne must have known that it was the Debtor's voice because: (1) the Debtor and Matherne had a business relationship with one another and had spoken in the past; and (2) the Debtor is the only one who Matherne could reasonably have expected to call upon him to foreclose the WCL, Dampkring, and Terra Development Deeds of Trust.

Matherne, as the Trustee under the Tax Transfer Deeds of Trust, was responsible for distributing the funds from the foreclosure sales that he conducted. At trial, Matherne provided two reasons for paying the excess proceeds to Perc and TRH, rather than to the preexisting lienholders (i.e., the Plaintiffs). First, he claimed that he was merely following the instructions set forth in the WCL and Dampkring Deeds of Trust. [*Id.* at 163:19–25]; [Finding of Fact No. 5]. Yet, this form for the Deed of Trust came from the

22

Debtor. [Sept. 13, 2011 Tr. 163:19–25]; [Finding of Fact No. 33]. Second, Matherne claimed that he was verbally informed that Perc and/or TRH would hold the proceeds until the preexisting lienholders made claims upon them. [*Id.* at 166:2–167:1]. Again, this information came from the Debtor. [*Id.*]. As an experienced attorney whose practice focuses largely on real estate law, Matherne should have known that the excess proceeds were required to be paid directly to the preexisting lienholders (i.e., the Plaintiffs). His excuse that he was "just following instructions" is an insufficient—indeed, a disingenuous—justification.

In sum, Matherne's significant role in and monetary gain from the conspiracy, coupled with his friendship (and therefore loyalty) to Allan Groves [Finding of Fact No. 6], convinces this Court that his testimony is not credible. Therefore, the Court gives little weight to Matherne's testimony.

(d) **Lance Kerness (Kerness)** – Kerness did not appear in Court but his deposition was read aloud during the trial. Kerness responded directly and pointedly to the questions posed to him. The Court finds his deposition testimony credible and therefore gives significant weight to his testimony.

(e) **Brien West** (West) – Overall, West answered the questions posed to him in a polite and concise manner. The Court finds that West is a credible witness and therefore gives significant weight to his testimony.

Specifically, the Court credits West's testimony that he was not involved in Dampkring other than to perform ministerial tasks at the direction of Robert P. Cowin. [Sept. 14, 2011 Tr. at 107:21–108:2]. The Court believes this testimony for a number of reasons. For example, West has never invested in real estate and has no experience in

lending money.  [*Id.* at 106:19–23].    In fact, in 2007 he did not even know what a transfer tax lien was.  [*Id.* at 106:24–107:2].  West only had a general understanding that Dampkring was going to be a continuation of whatever WCL had been doing.  [*Id.* at 109:19–110:11].  In fact, once Dampkring was formed, the Debtor ceased making tax transfer loans through WCL.  *See* [Finding of Fact Nos. 8 & 9] (finding that WCL made its last tax transfer loan on or about May 10, 2007, and that Dampkring began making tax transfer loans on June 25, 2007).

Additionally, both Robert P. Cowin and the Debtor testified that they believed West to be unorganized and unreliable, and the Debtor testified that he believed West has an alcohol problem.  [Sept. 15 2011 Tr. 42:5–16]; [Sept. 16, 2011 Tr. 26:9–16; 27:2–3; 29:7–17].  While this testimony clearly is an attempt to discredit West, it may have had an unintended effect.  Specifically, the Court does not believe that West would have been able to establish Dampkring and run the business on his own—which is what the Debtor wants this Court to believe in order to avoid himself having any ties to this entity—if, as the Debtor and Robert P. Cowin have testified, he is unorganized, unreliable, and has an alcohol problem.  Nor, for that matter, would the Debtor have facilitated a $75,000.00 loan to Dampkring from his father, Robert E. Cowin.[21]  [Adv. No. 10-03583, Doc. No. 11, ¶ 58].  Thus, the Debtor and Robert P. Cowin's characterizations of West actually support West's testimony that he was *not* involved in the day-to-day operations of Dampkring.

---

[21] Out of an abundance of caution, to avoid confusion, the Court notes here that Robert **P.** Cowin is the Debtor's son, and Robert **E.** Cowin is the Debtor's father.

(f) **Nancy Groves** – Nancy Groves was unable, or unwilling, to remember many details relevant to the dispute at bar, rendering much of her testimony unhelpful. The Court therefore gives almost no credibility to the statements she made.

The following are several examples of implausible or unhelpful statements that Nancy Groves made under oath before this Court:

1.   Despite having been married to Allan Groves, and having done a transaction with Perc on at least one occasion, Nancy Groves testified that she knew and remembered almost nothing about Perc (i.e., a company controlled by Allan Groves).  This alleged inability to remember includes her interaction with the company, or the company's relationship to her ex-husband, as the following exchange with Robert Maris, counsel for WMC, demonstrates:

| MARIS: | "It looks like you sold this property on Memorial Drive [i.e., the Chase Property] to Perc, am I correct? |
| NANCY GROVES: | That's what it says here, I can't remember. |
| MARIS: | And refresh me, what is the relationship between Perc LLC and Allan Groves? |
| NANCY GROVES: | I don't know, just that he knows about it. |
| MARIS: | Why did you sell the property on Memorial Drive to Perc? |
| NANCY GROVES: | I can't remember.   This was on 1/14/2008?" |

[Sept. 14, 2011 Tr. 214:15–22].

Moreover, during her deposition, which was also under oath, Nancy Groves had testified that "I thought [Allan Groves] owned [Perc]."  [Sept. 15, 2011 Tr. 19:5–8].  Yet, at trial, she was only willing to admit that Allan Groves "knew that Perc existed."  [Sept. 15, 2011 Tr. 7:1–2].  This testimony is, at best, ambiguous; it certainly seems unlikely

that Nancy Groves would remember so little about the sale of the Chase Property to Perc, or would know essentially nothing about her ex-husband's relationship to the company.

2.  Nancy Groves gave a similarly unhelpful response when asked this question: "Did you borrow money from a company called Dampkring?"  [Sept. 14, 2011 Tr. 218:22–23].  She answered—without elaboration—"I think I did."  [*Id.*].  Again, it seems remarkable to this Court that Nancy Groves would be so equivocal about this transaction with Dampkring, including, as the question asked, whether she had *ever* obtained a loan from this company.

Nancy Groves also refused to acknowledge at trial that she was aware of a relationship between Dampkring and the Debtor.  On September 14, 2011, she was asked, "did you understand that – was there a relationship in your mind between Dampkring LLC and [the Debtor]?"  She responded, simply, "No."  [*Id.* at 218:24–219:1].  On September 15, 2011, she was asked again, "Now is it your understanding that this Dampkring Company was owned by or at least controlled by [the Debtor]."  [Sept. 15, 2011 Tr. 18:6–7].  She responded, "I didn't know.  I didn't know.  In fact, I didn't even know—that it was a company called Dampkring."  [*Id.* at 18:8–9].  Yet, in her earlier deposition, when she was asked, "Tell me what you understand [the Debtor's] association with Dampkring is?," Nancy Groves answered, "I thought he [i.e., the Debtor] owned that company."  [*Id.* at 19:6–8].  The Court finds that Nancy Groves did, in fact, know of the Debtor's relationship to Dampkring and that her testimony at trial was deliberately evasive.

3. Under oath, Nancy Groves agreed that she always followed the same pattern with respect to obtaining tax transfer loans.  She would contact Allan Groves and he

would then communicate with the Debtor in order to obtain the loans. [Sept. 14, 2011 Tr. 217:13–17]. Yet, when asked, "so throughout the relationship since—from 2005 to I guess present, all the loans that were made for payment of taxes, that was handled by your former husband, Allan Groves?" Nancy Groves responded, "I think so. Maybe—". [*Id.* at 218:3–6]. Nancy Groves' response, particularly in conjunction with her earlier admissions, was so uncertain that the Court finds it to be unbelievable.

4. During trial, Nancy Groves testified that she did not know where Allan Groves lived or worked. [*Id*. at 190:5–17]. She was also vague about when she had spoken to him last, stating, "Probably yesterday." [*Id.* at 187:9-10]. Yet, Nancy Groves testified that she had known Allan Groves for well over *fifty* years. [*Id.* at 190:5–17]. They had been married for thirty-one years, and although they had been divorced since 1990 [*Id.* at 186:20–187:1], the couple nevertheless maintained a good relationship. [*Id.* at 187:2–8]. Nancy Groves also testified that she continues to communicate with Allan Groves and that she currently shares a P.O. Box with him. [*Id*. at 187:6–24]. In fact, she stated that she had seen Allan Groves earlier in the week (i.e., the week that she provided testimony) in order to deliver mail to him. [*Id*. at 192:20–193:16]. In light of these admissions, the Court does not believe that Nancy Groves did not know where Allan Groves resides or what he does for a living.

5. Nancy Groves' testimony revealed that, at the very least, she played a passive role in the conspiracy, maintaining a deliberate ignorance of the details. She relied on Allan Groves to help her locate properties to purchase at foreclosure [*Id.* at 218:10–21], to communicate with the Debtor to obtain tax liens on the properties, to procure the documentation, and to negotiate the terms. Moreover, despite claiming that she "always

27

thought about each [purchase] very carefully, and examined the figures and everything else" [Sept. 15, 2011 Tr. 29:4–9], she did not read any of the documents, including the deeds of trust, before signing them.  [*Id.* at 12:6–13].

Furthermore, Nancy Groves testified that, in 2007, with the assistance of Allan Groves, she purchased four properties at foreclosure sales with the supposed desire to make one of them her permanent residence.  [*Id.* at 23:15–19].  Nancy Groves repeatedly testified that she purchased these properties as possible homesteads and that when she realized that they were unsuitable for this purpose, allowed them to go into foreclosure. [Sept. 14, 2011 Tr. 199:16:23; 210:11–12; 207:16–20; 209:11–16]; [Sept. 15 2011 Tr. 9:4–25].  Late on the second day of her testimony, however, she suddenly declared that she also considered keeping each of them for investment purposes.  [Sept. 15, 2011 Tr. 29:10–12].  Nevertheless, in each case, Nancy Groves took out tax loans on the properties almost immediately after purchasing them.  As Nancy Groves admitted, none of these loans were necessary [*Id.* at 32:8–33:1]; yet, she subsequently failed to make a single payment on any of them.  [*Id.* at 30:11–15].  When the properties were each ultimately allowed to go into foreclosure, she then lost money.  [*Id.* at 31:13–18; 27:6–8].

Based on this testimony, the Court finds that Nancy Groves' explanations for her purchases of these properties to be peculiar and ultimately unbelievable.  If the properties were for her homestead, then the Court finds it odd that Nancy Groves would purchase so many properties sight unseen, and then immediately burden them with an unnecessary tax loan.  If the properties were for investment purposes, then the Court finds it odd that Nancy Groves would purchase so many properties without reading the paperwork, and

then immediately allow them to go into foreclosure at a loss.  As either explanation is suspect, the Court does not believe Nancy Groves' testimony on these points.

In sum, the Court concludes that Nancy Groves' testimony largely lacks credibility based on her less than candid testimony, her close relationship with Allan Groves, and her role in the scheme.  The Court therefore gives very little weight to her testimony.

(g) **Robert P. Cowin** (the Debtor's son) – Robert P. Cowin did not appear in Court, but his video deposition was played during the trial.  The Court finds that his deposition testimony was fairly credible and gives some weight to his testimony.

The Court credits Robert P. Cowin's testimony that he knew very little about the business of granting tax loans and was not involved with the day-to-day business of either WCL or Dampkring.  For example, Robert P. Cowin testified that his "role with regard to the tax lien aspects of WCL was limited to, basically, couriering documents and picking up things from the courthouse."  [Sept. 15, 2011 Tr. 41:8–11].  He testified that he had only a limited understanding of how WCL was involved in transfer tax loans [*Id.* at 38:11–39:3], and that he was not involved in negotiating, preparing, closing, or servicing any of the WCL transfer tax loans.[22]  [*Id.* at 39:24–41:1].  In regards to Dampkring, Robert P. Cowin testified that he did not provide any loan documents to Dampkring for

---

[22] The Court credits this testimony and does not believe the Debtor's testimony contradicting this point, which the Court finds was an attempt by the Debtor to once again distance himself from having had any involvement with Dampkring.  For example, the Debtor testified that "Rob knew—I believed he knew a fair amount.  I had . . . given him a book on transfer tax liens.  He obviously for [WCL] spent some time with [WCL] documents.  My intention was for Rob as part of sort [*sic*] an educational process was to understand transfer tax lien [*sic*]."  [Sept. 16, 2011 Tr. 18:2–9].  When asked whether he thought his son's testimony that he was not involved in making transfer tax loans for Dampkring was true, the Debtor responded, "I mean I don't know what the word 'involved' means from his perspective, but I believe my son is telling the truth."  [*Id.* at 18:15–16].  The Debtor's testimony underscores his inability to tell the truth, the whole truth, and nothing but the truth.  His answers were dissembling and designed to obfuscate.

use in making tax loans [*Id.* at 48:8–10], was not involved in loaning money on behalf of Dampkring [*Id.* at 43:22–23] and, in fact, did not even know if Dampkring ever made loans for the purpose of the payment of real property taxes.  [*Id.* at 45:4–8].

However, the Court does not believe certain testimony by Robert P. Cowin, which the Court finds was an attempt to protect his father (i.e., the Debtor).  For example, Robert P. Cowin testified credibly that the idea to start Dampkring did not come from either him or West, but the Court does not believe his testimony that he did not know whose idea it was to start Dampkring.  [*Id.* at 43:4–13].  Rather, the Court finds that it was the Debtor's idea to start Dampkring as a vehicle to carry on the transfer tax lien business without having his name directly linked to the company, and that Robert P. Cowin, at the very least, knew that it was his father's idea to start Dampkring and that his father ran the day-to-day business of Dampkring.

In sum, the Court finds that Robert P. Cowin's testimony is for the most part credible, except as it represents an attempt to protect his father, and gives some weight to his testimony.

(h) **Charles Cowin** (the Debtor) - The Debtor's testimony was, to a large extent, either non-responsive or evasive—particularly in regards to his involvement with Dampkring.

For example, the Debtor was intentionally vague regarding the loan his father, Robert E. Cowin, made to Dampkring.  The Debtor stated that he facilitated this loan, but when asked to describe what he had to do with facilitating the loan, he responded:  "All that I recall was [*sic*] is that my father's money was given to Dampkring so that they could utilize it in the business."  [Sept. 16, 2011 Tr. 13:19–25].  When asked again, the Debtor stated:  "All that I recall was give the cash that my father lent to Dampkring."  [*Id.*

30

at 14:6–9].  Even after continued, pointed questioning regarding how, exactly, the loan came to be, it is still not completely clear to the Court.  This confusion is the result of the Debtor's deliberately ambiguous responses.

The Debtor was also somewhat vague about his role in the preparation of the Cowin and WCL Deeds of Trust.  In regards to the Cowin Deeds of Trust, the Debtor testified that he *believed* that he had "prepared the [Cowin Deeds of Trust], *at least most of them*."  [Sept. 15, 2011 Tr. at 73:13–14].  Similarly, when asked whether he prepared the WCL Deeds of Trust, the Debtor testified "Yes, I did.  The documents came out of my computer and *I believe* I prepared them.  Yes."  [*Id.* at 107:14–15].

When asked the follow-up question, "And no one else, other than you had access to those documents.  Is that true?" the Debtor testified that possibly his son, Robert P. Cowin, may have had access to the WCL Deed of Trust documents on his (i.e., the Debtor's) computer that would enable Robert P. Cowin to change those documents.  [*Id.* at 107:21–108:1].  Opposing counsel then took the Debtor through Robert P. Cowin's testimony, in which Robert P. Cowin testified definitively that he did *not* have access to any of the WCL Deeds of Trust, and, in fact, did not even know where they were located.  [*Id.* at 109:25–110:4].  Thus, despite the Debtor's attempts to be vague about his role in the preparation of the WCL Deeds of Trust, the Court finds that the Debtor was, indeed, solely responsible for drafting and preparing the WCL Deeds of Trust.  In so finding, the Court also finds that the Debtor was solely responsible for omitting the language from the WCL Deeds of Trust that would have required any amounts required by Texas law to be paid before payment to the Grantor.  *See* [Finding of Fact No. 33].  The Debtor's testimony that "I believe I prepared them"—suggesting that he is not definitely sure—is

31

pure poppycock.  He knows full well that he drafted the WCL Deeds of Trust, and his unwillingness to simply admit as such underscores his constant dissembling.

Further, the Court does not believe the Debtor's testimony that he did not know from where Dampkring obtained its deed of trust forms [Sept. 16, 2011 Tr. 9:8–11].  As noted in Finding of Fact No. 33, the Dampkring Deeds of Trust were the same as the WCL Deeds of Trust, and both the WCL and Dampkring Deeds of Trust were substantially the same as the Cowin Deeds of Trust but for the omitted language in the WCL and Dampkring Deeds of Trust that would have directed payment of excess proceeds to the preexisting lienholders.  *See also* footnote 16.  Thus, not only does the Court find that the Debtor was aware of where the Dampkring Deeds of Trust came from, but the Debtor was responsible for preparing the Dampkring Deeds of Trust.  *See* [Finding of Fact No. 33].

The Court also finds that the Debtor intentionally omitted the requirement to pay "any amounts required by law to be paid before payment to Grantor" from the WCL and Dampkring Deeds of Trust.  The omission of this language, coupled with the instruction the Debtor gave Matherne to simply follow the language in the Tax Transfer Deeds of Trust, enabled the Debtor to divert the excess proceeds from the foreclosure sales away from the Plaintiffs, who were the rightful recipients, and instead ensure that the proceeds were deposited with entities controlled by the Debtor's co-conspirator, Allan Groves.  *See* [*id.*].

Additionally, the Court finds that the Debtor's testimony at trial that he was only familiar with Dampkring "to a small extent" and was not involved in the day-to-day operations of the company is patently false.  [Sept. 15, 2011 Tr. 49:24–25]; [Sept. 16,

32

2011 Tr. 7:1–3]. For the reasons discussed in Finding of Fact No. 34, the Court finds that the Debtor was, in fact, in control of Dampkring. The Debtor's testimony on this point is blatantly misleading.

The foregoing serve as representative examples of the Debtor's testimony at trial. When it came to describing his role in relation to Dampkring, the Debtor's testimony was, at best, vague, and, at worst, downright false. In sum, the Court finds that the Debtor is not a credible witness and gives almost no weight to his testimony.

(i) **Allan Groves** – Allan Groves testified on July 9, 2012, and he pleaded the Fifth Amendment to nearly every question asked. In a civil proceeding, such as a suit in bankruptcy, the Court may draw an adverse inference regarding the question when the Fifth Amendment is asserted. *See e.g.*, *Dwan v. City of Boston*, 329 F.3d 275, 281 (1st Cir. 2003) (stating that "negative inferences—outside of criminal prosecutions—are not automatically forbidden under the Fifth Amendment").

Specifically, the Court draws an adverse inference from Allan Groves' refusal to admit to having had any affiliation whatsoever with Perc, TRH, or Kerness. [Tape Recording, 07/09/2012 Tr. at 5:11:58–5:16:10 p.m.]. In fact, the Court has found that Allan Groves established both Perc and TRH, and hired Kerness to serve as the nominal head of these entities as a way to conceal his own involvement with them. [Finding of Fact No. 7]. Further, the Court draws an adverse inference from Allan Groves' assertion of the Fifth Amendment in response to questions inquiring whether he received money from Perc or TRH. [Tape Recording, 07/09/2012 Tr. at 5:16:12–30; 5:17:25–47 p.m.]. The Court finds that Allan Groves did, in fact, receive substantial sums of money from Perc and TRH, and that these funds represent the last known accounting for the excess

proceeds from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property, among others.  [Finding of Fact No. 37].

Additionally, the Court draws an adverse inference from Allan Groves' assertion of the Fifth Amendment to virtually every question posed regarding the conspiracy.  For example, Allan Groves asserted the Fifth Amendment when asked whether he knew the Debtor [Tape Recording, 07/09/2012 Tr. at 5:21–20 p.m.], whether he knew that the Debtor was engaged in the tax loan business [*Id.* at 5:22:05–20 p.m.], whether he facilitated loans made from the Debtor in his own name to Nancy Groves [*Id.* at 5:22:27–45], whether he was aware of or was involved in arranging WCL loans made to Perc and Nancy Groves [*Id.* at 5:24:00–50 p.m.], whether he knew G.P. Matherne [*Id.* at 5:26:03–15 p.m.], and whether he received any of the excess proceeds from the foreclosure sales. [*Id.* at 5:28:20–40 p.m.].   Allan Groves' refusal to respond to this entire line of questioning lends further support to this Court's conclusion in section C.1. *infra* that Allan Groves, along with the Debtor, Nancy Groves, and G.P. Matherne, was engaged in a conspiracy to deprive the Plaintiffs of their liens on the Countrywide Property, the Chase Property, and the WMC Property, as well as on the proceeds from the foreclosure sales of those properties.

Further, the Fifth Circuit permits an adverse inference to be drawn against a party due a non-party witness' assertion of the Fifth Amendment privilege against self-incrimination.  *Fed. Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995).  This is particularly appropriate where, as here, the witness and the party to the lawsuit are co-conspirators.  *See State Farm Mut. Auto Ins. Co. v. Abrams*, No. 96-C-6365, 2000 WL 574466, at *7 (N.D. Ill. May 11, 2000) (allowing an

adverse inference to be drawn against a party from an alleged co-conspirator's invocation of the Fifth Amendment); *United States v. Dist. Council of N.Y. City & Vicinity of the United Bhd. Of Carpenters & Joiners of Am.*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993) ("the refusal to testify by a proven co-conspirator may justify an adverse inference against the other co-conspirators"); *see also infra*, section C.1., pp. 45–49 (concluding that the Debtor, Allan Groves, Nancy Groves, and G.P. Matherne were co-conspirators). The rationale for drawing a negative inference against the Debtor due to Allan Groves' assertion of the Fifth Amendment in response to questions posed about the conspiracy is two-fold:   (1)  as co-conspirators and longtime friends, Allan Groves and the Debtor share a close relationship and likely have some degree of loyalty towards one another; and (2)  Allan Groves and the Debtor have similar knowledge of the conspiracy and share similar interests, especially since both have been subject to lawsuits as a result of the conspiracy.[23]  *See Libutti v. United States*, 107 F.3d 110, 122 (2d Cir. 1997) (discussing factors that courts use in determining whether to draw an adverse inference against a party due to a non-party's assertion of the Fifth Amendment).  For these reasons, the Court draws the adverse inference that, had Allan Groves responded to questions posed about the conspiracy, his testimony would have been damaging not only to him but also to the Debtor.

## IV. CONCLUSIONS OF LAW

## A.  Jurisdiction, Venue, and Constitutional Authority to Enter Final Judgments

### 1.  Jurisdiction

---

[23] *See BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, Civ. Action No. 09-2539, 2012 U.S. Dist. LEXIS 140373, at *69–70 (S.D. Tex. Sept. 28, 2012), wherein TRH, an entity controlled by Allan Groves, was named as a defendant along with Nancy Groves, Matherne, and the Debtor.  This suit was brought by a mortgage servicer for damages arising from the same pattern of behavior at issue in the dispute at bar.

This Court has subject matter jurisdiction over these three adversary proceedings[24] pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  These suits are core proceedings under 28 U.S.C. § 157(b)(2)(I) because each suit is a proceeding to determine the dischargeability of a debt, and these suits are also core under the general "catch-all" language of 28 U.S.C. § 157(b)(2) because each suit is the type of proceeding that can only arise in the context of a bankruptcy case.  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

While these suits necessarily require this Court to determine the existence and amount of debts pursuant to state law, the Fifth Circuit has held that bankruptcy courts have the jurisdiction to enter money judgments against debtors in conjunction with finding that a debt is non-dischargeable because "litigation necessary to prove nondischargeability also proves the basis for and amount of the debt."  *See Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479–80 (5th Cir. 2009) (reviewing case law from other circuits and opting "to follow the overwhelming authority and agree that the bankruptcy court had jurisdiction to enter judgment against [the Debtor] for the debt owed to [the plaintiff] after it found the debt nondischargeable.").

2.  Venue

Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

3.  Constitutional Authority

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' authority to enter final orders.  *Stern v. Marshall*, 131 S. Ct. 2594 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for

---

[24] These are adversary proceedings pursuant to Rule 7001(6) of the Federal Rules of Bankruptcy Procedure.

any matter brought before it.  The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final judgment.

In *Stern*, the Debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. *Id.*  Here, the matters before the Court are not counterclaims by the Debtor or the estate brought pursuant to state law, but rather are three adversary proceedings brought to determine the nondischargeability of debts pursuant to 11 U.S.C. § 523(a)—an express provision of the Bankruptcy Code.  "Determining the scope of the debtor's discharge is a fundamental part of the bankruptcy process[,]" and was unchanged by the decision in *Stern*.  *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).

The instant disputes also require the Court to determine the existence of debts under state law in order to assess whether these debts are dischargeable.  However, whereas *Stern* dealt with issues of solely state law where the determination of the debtor's counterclaim was not necessary to decide whether the defendant had a valid claim, here, the determination of the Plaintiffs' claims is necessary in order for this Court to determine whether those claims are dischargeable. As the Supreme Court discussed in *Stern*, a right closely integrated into a public regulatory scheme falls within the "public rights exception," and may be adjudicated by a non-Article III tribunal.  *Stern*, 131 S. Ct. 2594; *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593–94 (1985).  Here, liquidating the Plaintiffs' state law claims against the Debtor is "closely integrated" into the Bankruptcy Code because it must first be established that the Plaintiffs have claims against the Debtor in order for this Court to determine whether those claims are dischargeable in the Debtor's bankruptcy case.  *In re Carroll*, 464 B.R. at 312.

In connection with finding that bankruptcy courts have the jurisdiction to hear unliquidated state law claims for money judgments in conjunction with determining the dischargeability of those claims in bankruptcy, the Fifth Circuit's decision in *Morrison* also held that bankruptcy courts have the *authority to enter final judgments* on these claims. *Morrison*, 555 F.3d at 478–79. A recent case addressing the potential impact of *Stern* on this holding stated as follows:

> The defendant overreads [*Stern*] and its application to this proceeding. Even if the defendant were right, however, the court would be compelled to follow existing Fifth Circuit precedent as set out in *Morrison* . . . as this court cannot ignore (much less 'overrule') existing binding circuit precedent, even if that precedent is thought to be inconsistent with a later decision by the Supreme Court. Only the circuit itself can overrule its own precedents.

*Christian v. Kim (In re Kim)*, 2011 Bankr. LEXIS 2659, at *6 n.2 (Bankr. W.D. Tex. July 11, 2011); *see also Dagisic v. Boricich (In re Boricich)*, 2011 WL 5579062, at *1 (Bankr. N.D. Ill. Nov. 15, 2011) ("*Stern* left intact the authority of a bankruptcy judge to fully adjudge a creditor's claim. In this case, the claim was an adversary proceeding against debtor to bar dischargeability of a debt due to Plaintiff. Therefore, the authority to enter a final dollar judgment as part of the adjudication of nondischargeability . . . was not impaired by *Stern*"). This Court similarly finds that the instant dispute is distinguishable from *Stern*, and, therefore, this Court is constitutionally authorized to enter a final judgment on both the Plaintiffs' claims themselves and the issue of whether these claims are nondischargeable pursuant to 11 U.S.C. § 523(a).

Finally, and in the alternative, the Plaintiffs and the Debtor have all consented to this Court's entry of a final judgment. At a status conference held on April 24, 2012, this Court specifically asked the parties: "Would you consent to my entering a final judgment? Mr. McKleroy? 'Yes, your honor, I would.' Mr. Maris? 'Yes.' Mr. Colbert? 'I believe so.' [Tape Recording, 04/24/2012 Hearing at 11:22:44–11:23:05 a.m.]. The Court then instructed Mr.

Colbert that it needed a firm "yes" or "no" in response to the question of consent, to which Mr. Colbert definitively responded, "Yes, your honor." [*Id.*]. The Fifth Circuit recently held, in a case decided after *Stern*, that magistrate judges have constitutional authority to enter final judgments on counterclaims *where both parties consent*. *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Co.*, 673 F.3d 299 (5th Cir. 2012). The logical extension of the Fifth Circuit's decision is that bankruptcy courts, as fellow Article I courts, also have constitutional authority to enter final judgments on otherwise non-core matters where all of the parties consent. Other bankruptcy courts have come to the same conclusion. *See, e.g., In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 699–700 ("A Bankruptcy Judge may enter a final judgment in a non-core proceeding that is otherwise related to a bankruptcy case if the parties consent.") (Bankr. N.D. Ill. 2011); *Executive Sounding Bd. Assocs. v. Advanced Mach. & Eng'g Co. (In re Oldco M Corp.)*, 484 B.R. 598, 605 (Bankr. S.D.N.Y. 2012) (noting that, "[i]n *Stern* itself, the Court acknowledged that the parties may consent to entry of a final order or judgment by a bankruptcy judge in non-core matters.") (citing *Stern*, 131 S. Ct. at 2606, 2609). Thus, even if resolution of the Plaintiffs' state law claims is deemed non-core, this Court has constitutional authority to enter final judgments as to these claims because all of the parties have consented.

**B. The Plaintiffs Have Standing to Bring the Instant Adversary Proceedings**

Next, the Court must address the Debtor's argument that the Plaintiffs lack standing. The Plaintiffs have proven that they held valid, preexisting mortgage liens on the properties at issue. The original liens on the Chase Property, the WMC Property, and the Countrywide Property were recorded in the real property records of Harris County, Texas near the time of the execution of the original loans. [Finding of Fact Nos. 13, 19 & 24]. However, the assignments of two of these loans—specifically, of the loan related to the Countrywide Property from ABC to IMPAC

and of the loan related to the Chase Property from WMC to Wells Fargo–were not recorded in the real property records for Harris County, Texas.  [Finding of Fact Nos. 14 & 24].  The Debtor contends that Plaintiffs Deutsche Bank, as trustee to IMPAC, and Wells Fargo lack standing to bring the instant causes of action against him because:  (1) they did not record these assignments; and (2) he is not a party to the original instruments (i.e., he did not sign the promissory notes).

The Debtor cites section 192.007(a) of the Texas Local Government Code in support of this proposition.  Section 192.007(a) provides that any transfer or assignment of a recorded deed of trust must also be recorded in the office of the county clerk.  TEX. LOCAL GOV. CODE § 192.007(a).  As a United States Magistrate Judge for the Southern District of Texas recently noted in regards to section 192.007(a) of the Texas Local Government Code, "[n]o reported case has interpreted this 1989 law [and t]he legal consequences of failing to comply with this statutory command are unclear.  *Miller v. Homecomings Financial LLC*, 881 F. Supp. 2d 825, 830 (S.D. Tex. 2012).

In *Miller*, the plaintiff-homeowners challenged the defendant-banks' standing to foreclose due to their alleged inability to show "proper chain of title of the note and security instrument."  *Id.* at 827.  The Magistrate Judge noted that failure to record an assignment in accordance with section 192.007(a) of the Texas Local Government Code "is arguably some evidence that no such assignment or transfer has occurred."  *Id.* at 830.  However, the court also indicated that proper chain of title may be proven in other ways.  Namely, "[a] person not identified in a note who is seeking to enforce it as the owner must prove the transfer by which he acquired the note.  Such a transfer may be proved by testimony as well as by documentation." *Id.* at 829 (internal citation omitted) (citing *Priesmeyer v. Pacific Southwest Bank*, 917 S.W. 2d 937, 939 (Tex. App. 1996)).

Here, Plaintiffs Deutsche Bank and Wells Fargo have proven the transfers by which they acquired the notes.  Plaintiff Deutsche Bank introduced the credible testimony of Ms. Alvarez in order to prove that the original note and deed of trust on the Countrywide Property was assigned to IMPAC and that IMPAC authorized Deutsche Bank to serve as its trustee.  [Sept 13, 2011 Tr. 46:2–15].  Plaintiff Wells Fargo introduced the credible testimony of Mr. Smith to prove that the original note and deed of trust on the Chase Property was assigned to it.  [*Id.* at 67:8–17].  Through this testimony—which is uncontroverted—Deutsche Bank and Wells Fargo have established that they had standing to foreclose on the Countrywide Property and the Chase Property, respectively.

Another related line of cases has held that the absence of recordation in compliance with section 192.007 of the Texas Local Government Code "does not affect the validity of the assigned deed of trust *between the homeowner and the lender*."  *See Hill v. U.S. Bank, N.A. (In re Perry)*, No. 11-35205, 2013 Bankr. LEXIS 534, at *8 (Bankr. S.D. Tex. Feb. 8, 2013) (collecting cases) (emphasis added).  These cases have followed the established rule that "[u]nder Texas law, there is no requirement that the deed of trust assignment be recorded." *Herrera v. Wells Fargo* Bank, 2013 U.S. Dist. LEXIS 33592, at *36 (S.D. Tex. Mar. 12, 2013) (citing *Bittinger v. Wells Fargo Bank, N.A.*, 744 F. Supp. 2d 619, 625 (S.D. Tex. 2010)).[25] However, these cases dealt with the original borrower under the note and deed of trust and an assignee bank.

---

[25] For example, in *Herrera*, the plaintiff-homeowner asserted that the defendant-bank lacked standing to foreclose due to, among other things, its failure to record its assignment in accordance with Texas Local Government Code section 192.007.  *Herrera*, 2013 U.S. Dist. LEXIS 33592, at *4.  In its decision, the court did not even address section 192.007, but rather followed established case law holding that recordation of an assignment of a deed of trust is not required for the deed of trust to be enforceable, at least as to the parties to the original instrument.  *Id.* at *9.

The instant disputes deal not only with assignee banks, but with a third party (i.e., the Debtor) who was not the original borrower and grantor under the notes and deeds of trust on the Countrywide Property and the Chase Property.  The cases that have thus far dealt with section 192.007(a) of the Texas Local Government Code do not resolve the issue under these circumstances "with respect to third parties."  *In re Perry*, 2013 Bankr. LEXIS 534, at *7–8.  In *Perry*, the bankruptcy trustee argued that, due to the defendant-bank's failure to record its assignment of the deed of trust in compliance with section 192.007(a) of the Texas Local Government Code, he, as a bona fide purchaser of real property,[26] took the property free and clear of the deed of trust.  *Id.* at *8.  The court focused on whether the trustee was charged with having had inquiry notice of the bank's security interest, and noted that "[t]he recorded deed of trust put a bona fide purchaser on inquiry notice to inquire as to the status of the recorded deed of trust."  *Id.* at *9.

The disputes at bar similarly deal with the validity of assigned deeds of trust with respect to third parties (i.e., the assignee banks and the Debtor), none of whom were parties to the original instruments.  Thus, the concept of inquiry notice is equally applicable.  Here, the Debtor, Matherne, Allan Groves, and Nancy Groves were not only charged with inquiry notice, but had actual notice that the Countrywide Property, the WMC Property, and the Chase Property were encumbered with preexisting mortgage liens.  Nancy Groves and Allan Groves, who purchased properties through his companies TRH and Perc, had knowledge that the Countrywide Property, the Chase Property, and the WMC Property were encumbered with preexisting mortgage liens at the time they purchased these properties.  *See* [Finding of Fact Nos. 15, 20, 25  & 31]; [Sept. 14, 2011 Tr. 203:2–25].  The Debtor and Matherne also knew that the Countrywide Property, the Chase Property, and the WMC Property were subject to preexisting liens—as Matherne testified,

---

[26] *See* 11 U.S.C. § 544.

when the Debtor called Matherne to instruct him to foreclose on a property, the Debtor also instructed him to obtain a title report, which Matherne always did.  [Finding of Fact No. 36]; [Sept. 13, 2011 Tr. 106:1–21; 131:3–137:8].  The purpose of the title report was to ascertain the preexisting lienholders on the property.  [Finding of Fact No. 36]; [Sept. 13, 2011 Tr. 101:16–25].

Further, although the assignments of the loan related to the Countrywide Property from ABC to IMPAC and of the loan related to the Chase Property from WMC to Wells Fargo were not recorded in the Harris County real property records, they were recorded with MERS. [Finding of Fact Nos. 14 & 24].  The original Deeds of Trust on both the Countrywide Property and the Chase Property name MERS as nominee for the respective lenders and identify the mortgages as being registered with MERS.  [Ex. No. 86, p. 2]; [Ex. No. 45, p. 2]; [Sept. 13, 2011 Tr. 54:23–25; 57:19–24; 73:6–22].   Under these circumstances, the following language is particularly informative:

> When, as here, the deed of trust names MERS as the nominee for the lender and its successor and assigns and the deed of trust is recorded in the local real-property records with MERS as the named beneficiary, MERS remains the mortgagee of record if the note is transferred between MERS members, and there is no requirement that the deed of trust be re-recorded each time it is transferred.

*Campbell v. Mortg. Elec. Registration Sys., Inc.*, 2012 WL 1839357, at *4 (Tex. App. 2012) (citing *Knighton v. Merscorp, Inc.*, 300 F. App'x 285, 286 (5th Cir. 2008)).  The point here is that a party conducting a search of the Harris County real property records would be alerted to the fact that the mortgages on the Countrywide Property and the Chase Property were registered with MERS, and could thereafter have discovered Deutsche Bank and Wells Fargo's interests simply by contacting MERS.

In conclusion, Texas case law has so far held that the assignee of a deed of trust is not required to record its interest for that interest to be effective. Although case law interpreting section 192.007(a) of the Texas Local Government Code is scant, those cases that have addressed the provision as it applies to third parties (who were not parties to the original deed of trust) have focused whether the third parties had notice of the preexisting security interest. Here, the Court finds that Plaintiffs Deutsche Bank and Wells Fargo's failures to record their deed of trust assignments are not fatal to these parties' standing. Both parties have demonstrated that the original deeds of trust were recorded, thus putting any subsequent purchasers on inquiry notice, if they do not have actual notice, and have proven that they were the transferees of the original notes and deeds of trust. For these reasons, both Wells Fargo and Deutsche Bank have standing to pursue the instant causes of action.

## C.  The Debtor is Liable to the Plaintiffs for the Aggregate Amount of the Excess Proceeds

The Plaintiffs must first establish that the Debtor owes them debts before they can challenge the dischargeability of those debts. *Wilson v. Ramirez (In re Ramirez)*, No. 11-20614, 2012 Bankr. LEXIS 5100, at *11 (Bankr. S.D. Tex. Oct. 31, 2012). The Code defines a "debt" as "liability on a claim." 11 U.S.C. § 101(12). A "claim," in turn, is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . " 11 U.S.C. § 101(5)(A). Thus, the first issue this Court will address is whether the Debtor is liable to the Plaintiffs for the taking of the excess proceeds from the foreclosure sales of the Countrywide Property, the WMC Property, and the Chase Property, on which the Plaintiffs held preexisting mortgage liens.

Specifically, the Plaintiffs allege that the Debtor participated in a conspiracy to deprive them of their preexisting liens on the properties and abscond with the proceeds from the foreclosure sales. Thus, the Plaintiffs contend that they are owed debts based on violations of: (1) the Texas Theft Liability Act (TTLA), Chapter 134 of the Texas Civil Practice & Remedies Code; (2) Chapter 12 of the Texas Civil Practice & Remedies Code; and (3) the Texas Uniform Fraudulent Transfer Act (TUFTA), Section 24.001 *et. seq.* of the Texas Business & Commerce Code. Although federal bankruptcy law governs dischargeability of debts, the creation and validity of a debt is determined with reference to state law. *Grogan v. Garner*, 498 U.S. 279, 283–84 (1990). Here, the parties do not dispute that the laws of the State of Texas apply to the determination of whether the Debtor owes debts to the Plaintiffs.

1. The Debtor Participated in a Conspiracy to Deprive the Plaintiffs of Their Liens on the Countrywide Property, the Chase Property, and the WMC Property and on the Proceeds from the Foreclosure Sales of these Properties

Before turning to the Debtor's alleged violations of Texas law, this Court will first address the issue of whether the Debtor was a member of a civil conspiracy along with Matherne, Allan Groves, and Nancy Groves. This issue is important because, if the Court finds that the Debtor is a conspirator, then he may be held liable for the unlawful acts of any of his co-conspirators. *See Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).

Under Texas law, a civil conspiracy requires the following elements: (1) two or more people; (2) seeking a course of action; (3) a meeting of minds regarding that course of action; (4) an overt, unlawful act; and (5) damages as a proximate result of that act. *Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). To prove these elements, the Plaintiffs may use circumstantial evidence "coupled with common-sense knowledge of the behavior of persons in similar circumstances." *In re*

*Hearthside Baking Co., Inc.*, 402 B.R. 233, 251 (Bankr. N.D. Ill. 2009) (quoting *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1994)); *see also United States. v. Thomas*, 12 F.3d 1350, 1356 (5th Cir. 1994) (("A conspiracy agreement may be tacit, and the trier of fact may infer agreement from circumstantial evidence") (quoting *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988))).  Applying these five elements to the facts here, this Court concludes that the Plaintiffs have presented sufficient evidence to demonstrate by a preponderance of the evidence[27] that the Debtor, Matherne, Allan Groves, and Nancy Groves were engaged in a conspiracy to strip the Plaintiffs of their liens on the Countrywide Property, the Chase Property and the WMC Property and abscond with the proceeds from the foreclosure sales of those properties.

First, two or more parties were involved, with the Debtor, Matherne, Allan Groves, and Nancy Groves each taking a role in this scheme.  See [Finding of Fact Nos. 31–36].  Second, these parties, in conjunction, pursued a particular course of action:  to strip the Plaintiffs of their liens on the Countrywide Property, the Chase Property, and the WMC Property and abscond with the proceeds from the foreclosure sales of those properties.  Nancy Groves and Allan Groves (acting through TRH and Perc) participated by purchasing properties at foreclosure sales and, very shortly thereafter, impressing transfer tax liens against those properties in favor of entities controlled by the Debtor.  [Finding of Fact Nos. 31 & 32].  Nancy Groves and Allan Groves (acting through Perc or TRH) then intentionally defaulted on those loans [Finding of Fact No. 32], prompting the Debtor to call Matherne and instruct him to foreclose upon the properties.  [Finding of Fact No. 36].  The foreclosure sales stripped the Plaintiffs of their preexisting

---

[27] *See Days Inn Worldwide, Inc. v. Sonia Invs.*, Civil Action No. 3:04-CV-2278-D, 2007 U.S. Dist. LEXIS 29689, at *17 (N.D. Tex. Apr. 3, 2007) (noting that the burden of proof to demonstrate a civil conspiracy under Texas law is by a preponderance of the evidence).  This quantum of proof matches with the present quantum of proof required to establish that a debt is non-dischargeable under section 523(a).  *Grogan*, 498 U.S. at 286.

mortgage liens on the properties and, moreover, the Plaintiffs never received any of the proceeds from the sales. [*Id.*]. Instead, and in accordance with instructions from the Debtor as well as the language in the Tax Transfer Deeds of Trust, Matherne paid himself his Trustee's fee, the lender (i.e., the Debtor under the guise of Dampkring and WCL) for the tax lien, and the owner of the property (i.e., Allan Groves under the guises of Perc or TRH) all of the remaining proceeds. [*Id.*]. Matherne intentionally failed to pay anything to the Plaintiffs (i.e., the preexisting lienholders). Ultimately, this course of action resulted in excess proceeds belonging to preexisting lienholders being distributed, instead, to entities controlled by Allan Groves. Thus, the second element is met because the Debtor, Matherne, Nancy Groves and Allan Groves sought and participated in a course of action to strip the Plaintiffs of their preexisting liens on the properties at issue as well as to deprive them of the excess proceeds from the foreclosures of those properties.

The third element for civil conspiracy requires a meeting of the minds among the parties. Here, the co-conspirators' actions themselves (i.e., the purchases, the lending and borrowing for tax liens, the foreclosures of the properties, and the distribution of the resulting funds), together with the sheer number of foreclosures—seven of eleven of the loans made by WCL, and eleven of fifteen of the loans made by Dampkring—sufficiently demonstrate a meeting of minds among the Debtor, Matherne, Allan Groves, and Nancy Groves. [Finding of Fact Nos. 8 & 9]; s*ee Thomas*, 12 F.3d at 1356 (permitting the court to use circumstantial evidence to determine the existence of an agreement). Stated differently, coordination and agreement was needed for the co-conspirators to carry out the conspiracy successfully. The Court therefore concludes that Matherne, Nancy Groves, Allan Groves, and the Debtor had a meeting of minds regarding the course of action they would take.

As to the fourth element, the failure to pay the Plaintiffs any of the excess proceeds from the foreclosure sales constitutes an overt, illegal act. As discussed *infra* in section C.2., the failure to pay the Plaintiffs the excess proceeds to which they were entitled constitutes theft in violation of the TTLA. Additionally, as discussed *infra* in sections C.3. and C.4., causing the Tax Transfer Deeds of Trust to be recorded against the Countrywide Property, the Chase Property, and the WMC Property solely for the purpose of being able to foreclose those liens and then depriving the Plaintiffs of their security interests in the properties and in the proceeds from the foreclosure sales constituted overt, illegal acts in violation of Chapter 12 of the Texas Civil Practice and Remedies Code and the TUFTA. For these reasons, the fourth element of civil conspiracy is also established. Finally, as a result of the Debtor and his co-conspirators' actions, the Plaintiffs suffered $276,489.00[28] in damages. This amount reflects the aggregate amount of excess proceeds that Matherne failed to distribute to the Plaintiffs. *See* [Finding of Fact Nos. 18, 23 & 29]. Thus, the fifth and final element of civil conspiracy is met.

In sum, the Plaintiffs have satisfied each element for civil conspiracy under Texas law. As a result, the Debtor may be found liable not only for his own actions, but for *all acts* carried out by Matherne, Allan Groves or Nancy Groves in furtherance of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925–26 (Tex. 1979) (holding a co-conspirator jointly and severally liable for all acts done in furtherance of the conspiracy). Accordingly, the Court does not need to distinguish between the actions of the Debtor and those of Matherne, Nancy

---

[28] This amount reflects the sum of the total damages of $99,927.13 to Countrywide/Deutsche Bank for undistributed excess proceeds from the foreclosure of the Countrywide Property, $58,300.86 to WMC for undistributed excess proceeds from the foreclosure of the WMC Property, and $118,261.01 to Chase/Wells Fargo for undistributed excess proceeds from the foreclosure of the Chase Property. The Court notes that each of the three note holders on the Countrywide Property, the Chase Property, and the WMC Property suffered actual damages. However, in the case of the Countrywide Property, Countrywide, as mortgage servicer, and Deutsche Bank, as trustee for the holder of the note, are permitted to recover on behalf of the note holder, IMPAC. Similarly, in the case of the Chase Property, Chase, as mortgage servicer, is permitted to recover on behalf of the note holder, Wells Fargo.

Groves, or Allan Groves in its discussion below of this conspiracy and its illegality.  Rather, the actions of one extend to all.

    2.  <u>The Debtor is Liable to the Plaintiffs for Violations of the Texas Theft Liability Act</u>

First, the Plaintiffs allege that the Debtor committed theft in violation of the TTLA.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (2012).  "The TTLA provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief."  *Powers v. Caremark (In re Powers)*, 261 F. App'x 719, 721 (5th Cir. 2008).  A person is liable for a violation of the TTLA if he commits theft as defined under the Texas Penal Code.  TEX. CIV. PRAC. & REM. CODE ANN.  §§ 134.002 & 134.003.  The Texas Penal Code, in turn, provides that a person commits theft if he (1) unlawfully appropriates property (2) with intent to deprive the owner of the property.  TEX. PEN. CODE § 31.03(a).

The TTLA is silent as to what burden of proof should be applied.  However, under Texas law, legislative silence "'mitigates in favor of applying the same burden of proof as any other civil action'—the preponderance of the evidence standard."  *In re Powers*, 261 F. App'x at 721 (quoting *El Paso Ref., Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 381 (Tex. App. 2002)).  Therefore, the Plaintiffs bear the burden to demonstrate by a preponderance of the evidence that the Debtor violated the TTLA.  In order to do so, however, the Plaintiffs must also demonstrate that they had a right to receive the excess proceeds.  The Court will first address this question— whether the Plaintiffs had an interest in the various real properties and the excess proceeds from the sales thereof—and then turn to the question of whether the Debtor committed theft of these property interests in violation of the TTLA.

    *a.  The Plaintiffs had a right to the excess proceeds resulting from the foreclosure sales*

Under Texas law, "if there are surplus proceeds generated by [a] foreclosure sale after paying the trustee's fees and expenses and the existing indebtedness secured by the foreclosed lien, they are to be distributed to inferior lienholders, or to the holder of the equity of redemption if there are no inferior lienholders." *Conversion Properties, L.L.C.*, 994 S.W.2d at 813; *Wells Fargo Bank, N.A. v. 804 Congress L.L.C. (In re 804 Congress, L.L.C.)*, 2012 U.S. Dist. LEXIS 43183, at *21 (W.D. Tex. Mar. 28, 2012) (applying Texas law). Though a junior lienholder's lien on real property is stripped by virtue of the foreclosure sale, he retains a security interest in the surplus proceeds resulting from the sale. *See, e.g.*, *Pearson v. Teddlie*, 235 S.W.2d 757, 759 (Tex. Civ. App. 1950) (holding that a foreclosure sale destroyed the junior lienholder's lien on the land, but that his lien continued in the excess proceeds from the sale); *Diversified Mortg. Invs. v. Blaylock*, 576 S.W.2d 794, 808 (Tex. 1978) (holding that a junior lienholder whose lien was extinguished in a foreclosure sale was allowed to pursue the excess proceeds and noting that the proceeds "stand in the place of the property").

Despite the extensive case law directing that surplus proceeds from foreclosure sales be paid to junior lienholders, the Debtor argues that because the foreclosures at issue here were nonjudicial (also known as "contract foreclosures"), the proceeds were not required to be distributed to the junior lienholders (i.e., the Plaintiffs). [Sept. 13, 2011 Tr. 35:5–20; Sept. 15, 2011 Tr. 115:14–19]. The Debtor cites section 32.06(j) of the Texas Tax Code, which, as amended in 2005, provides as follows:

> The proceeds of a sale following a *judicial foreclosure as provided by this subsection* shall be applied first to the payment of court costs, then to payment of the judgment, including accrued interest, and then to the payment of any attorneys' fees fixed in the judgment. Any remaining proceeds shall be paid to other holders of liens on the property in the order of their priority . . .

50

TEX. TAX CODE § 32.06(j) (2005) (emphasis added).[29]

The prior version of this provision[30] read: "the proceeds of a sale following *foreclosure* as provided by this subsection . . . "    TEX. TAX CODE § 32.06(h) (1995) (emphasis added). According to the Debtor, the addition of the word "judicial" to the 2005 version meant that Matherne was not required by Texas law to distribute the proceeds from *nonjudicial* foreclosure sales to the junior lienholders (here, the Plaintiffs), and that Matherne acted properly by distributing the proceeds according to the language in the Tax Transfer Deeds of Trust.

This Court rejects the Debtor's argument.  It is true that the foreclosures at issue here were nonjudicial foreclosures, not judicial foreclosures as provided by subsection (j) of section 32.06 of the Texas Tax Code.  However, this fact does not mean that junior lienholders are no longer entitled to excess proceeds in the case of a nonjudicial foreclosure.  When read in context, the amended section 32.06(j) simply explains how proceeds are to be distributed in the event of a foreclosure suit, and then subsequent judicial foreclosure.  As the section reads in full:

> *If a foreclosure suit results in foreclosure of the lien*, the transferee is entitled to recover attorney's fees in an amount not to exceed 10 percent of the judgment. *The proceeds of a sale following a judicial foreclosure as provided by this subsection* shall be applied first to the payment of court costs, then to payment of the judgment, including accrued interest, and then to the payment of any attorney's fees fixed in the judgment.  Any remaining proceeds shall be paid to other holders of liens on the property in the order of their priority and then to the person whose property was sold at the tax sale.

TEX. TAX CODE § 32.06(j) (2005) (emphasis added).  Thus, where there is a foreclosure suit that leads to a judicial foreclosure, section 32.06(j) directs the distribution of additional amounts, such as court costs, judgment, interest, and attorneys' fees, that are required to be paid from the

---

[29] The prior version of this provision, which was previously labeled as subsection (h), omitted the reference to a "judicial" foreclosure and instead read: "the proceeds of a sale following foreclosure as provided by this subsection . . ."

[30] This provision was previously labeled as subsection (h).

proceeds.  In fact, in a case dealing with a nonjudicial foreclosure decided after the amendment

to section 32.06(j), the court applied the established rule that "[i]f there are excess proceeds

generated by the foreclosure sale after paying the trustee's fees and expenses and the existing

indebtedness secured by the foreclosed lien, the proceeds are distributed to inferior lienholders or

finally to the holder of the equity of redemption."  *See In re 804 Congress, L.L.C.*, 2012 U.S.

Dist. LEXIS 43183, at *21 (applying Texas law).

Additionally, the Debtor's argument that Texas law only required the proceeds to be

distributed according to the Tax Transfer Deeds of Trust makes little sense, particularly where,

as here, **the Debtor himself prepared the Deeds of Trust**.  [Finding of Fact No. 33].  If this

were the case, any lender preparing deeds of trust could direct payment however he chose; this

would, in effect, allow for an absurd result where a borrower and lender could contract away the

rights of other lienholders.  *See, e.g., City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex.

2008) (stating that statutes are construed according to their plain and common meaning, "unless

such a construction leads to absurd results").  It would be entirely contrary to the policy behind

allowing junior lienholders to collect from the excess proceeds of a foreclosure sale—they are

entitled to do so because their liens have been extinguished by virtue of the foreclosure sales.

*See, e.g., Pearson*, 235 S.W.2d at 759–60.

In sum, "[a] trustee under a deed of trust is required to disburse the proceeds of a

foreclosure sale as provided by Texas law."  *In re 804 Congress, L.L.C.*, 2012 U.S. Dist. LEXIS

43183, at *20 (citing Tex. Prop. Code Ann. § 51.0075(f)).  Texas law is clear that any excess

proceeds from foreclosure sales are to be paid to junior lienholders and cannot be distributed

solely according to the language in the deed of trust.  Matherne himself admitted that if the

instructions in the deed of trust conflict with the law—and here, the Tax Transfer Deeds of Trust

do conflict with the law—he is bound to follow the law.  [Sept. 13, 2011 Tr. 127:21–128:3].

Thus, the Plaintiffs had a right to the excess proceeds from the foreclosure sales of the Chase

Property, the WMC Property, and the Countrywide Property, and this right was superior to any

right of the Debtor, Allan Groves, Nancy Groves, or Matherne, or any entity which they

controlled.

### b.  The Debtor unlawfully appropriated the Plaintiffs' property

Now that this Court has determined that the Plaintiffs had a right to the excess proceeds,

it turns to the issue of whether the Debtor unlawfully appropriated this property.  To appropriate

means "to bring about a transfer or purported transfer of title to or other nonpossessory interest in

property, whether to the actor or another."  TEX. PEN. CODE §  31.001(4)(A).  Therefore, while

the Plaintiffs must demonstrate that the Debtor helped orchestrate the transfers of their property

(i.e., the proceeds), they are not required to show that the Debtor himself actually received any of

the proceeds from the foreclosures.  Appropriation of property is unlawful if it is without the

owner's consent.  *Id.* § 31.001(b)(1).

This element is met because the Debtor brought about the transfers of the excess proceeds

to Perc and TRH.  The Debtor was responsible for preparing the WCL and Dampkring Deeds of

Trust, which omitted the instruction to pay "any amounts required by law to be paid before

payment to [the] Grantor" and instead directed that all excess proceeds be paid directly to the

Grantor, which, in these cases, was either Perc or TRH (entities controlled by Allan Groves).

[Finding of Fact No. 33].  Although Matherne was the person who actually transferred the excess

proceeds, he testified that he did so because he was following the instructions in the WCL and

Dampkring Deeds of Trust, and the Debtor had instructed him to comply with the language in

the WCL and Dampkring Deeds of Trust; and also because the Debtor had informed him that

Perc and TRH would hold the proceeds until any junior lienholders made claims to them. [Finding of Fact No. 36]. While there is nothing in the record to demonstrate that the Debtor personally received any of the excess proceeds,[31] it suffices that the Debtor brought about the transfers to others (i.e., Perc and TRH) whose interests in the proceeds were inferior to the interests of the Plaintiffs thereto.

        *c.  The Debtor intended to deprive the Plaintiffs of their rights to the excess proceeds*

As to the second element, the intent to deprive under section 31.03(a) must exist at the time of the taking. *In re Powers*, 261 F. App'x at 722 (citing *Reed v. State*, 717 S.W.2d 643, 645 (Tex. App. 1986). "Texas courts have held that the element of intent, for the crime of theft, can be inferred from all of the surrounding circumstances." *Id.* (citing *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Cr. App. 1989). Here, the structure of the conspiracy, as discussed in Finding of Fact Numbers 30 through 37 and in section C.1. above, shows by a preponderance of the evidence that the Debtor intended to deprive the Plaintiffs of their rights to the excess proceeds.

Of particular importance is the fact that the Debtor altered the language in the WCL and Dampkring Deeds of Trust to omit the instruction to "pay any amounts required by law to be paid before payment to Grantor," thus directing that the excess proceeds be paid directly to the grantors Perc and TRH. [Finding of Fact. No. 33]. The Court finds that the Debtor omitted this language intentionally, given that the Debtor, an extremely sophisticated person with substantial business acumen [Finding of Fact No. 3], was solely responsible for preparing the WCL and Dampkring Deeds of Trust and had previously included this instruction in deeds of trust related

---

[31] Rather, Kerness (i.e., the nominal head of Perc and TRH) testified that he distributed all of the funds from Perc and TRH to Allan Groves and Nancy Groves. [Finding of Fact No. 37].

to tax transfer loans he had granted in his own name (i.e., the Cowin Deeds of Trust).  [Finding of Fact. No. 33].

Also relevant are the facts that the Debtor granted tax transfer loans through WCL and Dampkring without considering the borrowers' abilities to repay and foreclosed on these loans within a very short period of time.  [Finding of Fact Nos. 8, 9 & 35].  As the Debtor himself testified, the primary way to make money off of tax transfer loans is to hold the loans and collect interest from the borrowers.  [Sept. 15, 2011 Tr.  68:21–69:7].  Yet, with regards to the WCL and Dampkring tax transfer loans made to Perc and Nancy Groves, the Debtor admitted that there was no underwriting process involved to determine creditworthiness or ability to repay.  [*Id.* at 88:5–25; 96:22–97:20]; [Finding of Fact No. 35].

Finally, the sheer number of WCL and Dampkring foreclosures in a short period of time is indicative that the Debtor and his co-conspirators intended to deprive the Plaintiffs of their rights to the proceeds from the foreclosure sales.  [Sept. 15, 2011 Tr. 100:19–105:15]; [Ex. Nos. 24, 26, 27, 28, 30, 36, 38, 40, 42, 44, 53, 54, 56, 57, 59–61, 63–66, 67, 69, 71, 73, 75, 77, 79, 81, 83, 85 & 87].  The Debtor testified that, when granting tax transfer loans in his own name under the Cowin Deeds of Trust, there were very few foreclosures.  [Sept. 15, 2011 Tr. 80:7–14]. Thus, there is little reason to explain why so many of the properties described in the WCL and Dampkring Deeds of Trust were foreclosed upon such a short period of time other than that the Debtor and his co-conspirators intended for those properties to be foreclosed upon so that they could abscond with the excess proceeds from the foreclosure sales.

The Court finds that these facts (i.e., the omission of language in the WCL and Dampkring Deeds of Trust that would have directed payment of excess proceeds to the Plaintiffs, the fact that WCL and Dampkring granted tax loans to Nancy Groves and Perc without

considering these borrowers' abilities to repay, and the large number of WCL and Dampkring foreclosures that took place in a relatively short period of time), when considered together, indicate that there was never any intent by the borrowers to repay the loans, or by the Debtor that the loans would be repaid; rather, the intent of all of the parties involved was that these liens would go into foreclosure where the properties could be sold free and clear of the Plaintiffs' liens and the sale proceeds could be diverted to members of the conspiracy through distribution to Perc and TRH (entities controlled by Allan Groves).   For these reasons, the Court finds that the Plaintiffs have proven by a preponderance of the evidence that the Debtor intended to deprive the Plaintiffs of their rights to the excess proceeds.

As junior lienholders on the Countrywide Property, the Chase Property, and the WMC Property, the Plaintiffs had a right to receive the excess proceeds from the foreclosure sales of those properties.  Instead, the Debtor—through his own acts and the acts of his co-conspirators— unlawfully appropriated those proceeds with the intent to deprive the Plaintiffs of their rights to them.  The Plaintiffs have met their burden of demonstrating by a preponderance of the evidence that the Debtor committed theft in violation of the TTLA.

> d.  *The Plaintiffs are entitled to damages resulting from the Debtor's violations of the TTLA*

This Court has concluded that the Debtor committed theft under the TTLA; therefore, the Defendant is liable to the Plaintiffs for damages resulting from those thefts.  *See* TEX. CIV. PRAC. & REM. CODE § 134.003(a).  Under the TTLA, a person who has sustained damages as a result of theft is entitled to recover actual damages and additional statutory damages not to exceed the sum of $1.0 million from the person who committed the theft.  *Id.* at § 134.005(a)(1).   In addition, each person who prevails in a suit under the TTLA shall be awarded court costs and reasonable and necessary attorneys' fees.  *Id.* at § 134.005(b).

Here, the Plaintiffs suffered actual damages in the total aggregate amount of $276,489.00 ($99,927.13 to Countrywide/Deutsche Bank, $58,300.86 to WMC, and $118,261.01 to Chase/Wells Fargo), plus interest.[32]  [Finding of Fact Nos. 18, 23 & 29].  The Court also awards each of the Plaintiffs the maximum amount of additional statutory damages permitted under TTLA of $1,000.00 per theft.  Finally, the Court awards each of the three Plaintiffs court costs and reasonable and necessary attorneys' fees.

3.  Chapter 12 of the Texas Civil Practice and Remedies Code

Chapter 12 of the Texas Civil Practice and Remedies Code provides a civil cause of action against a person who makes, presents or uses a document or other record with:  (1) knowledge that the document is a fraudulent lien or claim against real property or an interest in real property; (2) intent that the document or other record be given the same legal effect as a court record or document of a court evidencing a valid lien or claim against real property or an interest in real property; and (3) intent to cause another person to suffer financial injury.  TEX. CIV. PRAC. & REM. CODE § 12.002(a)(1)-(3).  The Plaintiffs allege that the Debtor violated this statute by causing the WCL and Dampkring Deeds of Trust to be recorded against the Countrywide Property, the Chase Property, and the WMC Property.  The Plaintiffs bear the burden of proof, *Gordon v. West Houston Trees, Ltd.*, 352 S.W.3d 32, 46 (Tex. App. 2011), and, if successful, they are each entitled to damages of $10,000.00 or the actual damages caused by the violation, whichever is greater, as well as court costs, reasonable attorneys' fees, and exemplary damages in an amount determined by the court.[33]  TEX. CIV. PRAC. & REM. CODE § 12.002(b).

---

[32] The calculation of interest is discussed *infra* in section C.5.b.

[33] Here, the Plaintiffs have not expressly requested exemplary damages, and this Court, in its discretion, therefore declines to award them.

a. *The Debtor knew that the Tax Transfer Deeds of Trust were fraudulent liens*

As a preliminary matter, this Court has already found that the Debtor was responsible for creating and drafting the WCL and Dampkring Deeds of Trust and causing these deeds of trust to be used in connection with tax transfer loans granted by WCL and Dampkring. [Finding of Fact No. 33].   The next issue is whether the Debtor knew that the WCL and Dampkring Deeds of Trust were fraudulent liens.  The term "fraudulent" is not defined in the Texas Civil Practice & Remedies Code, nor has "fraudulent" been succinctly defined by courts applying this provision of Chapter 12.

In *Vanderbilt Mortgage & Finance, Inc. v. Flores*, the lien at issue was forged and falsely notarized, making it so clearly fraudulent that the defendants did not attempt to argue that it fell outside the term "fraudulent lien."  *Vanderbilt Mortgage & Finance, Inc. v. Flores*, 692 F.3d 358, 363 (5th Cir. 2012).  Thus, the Fifth Circuit failed to address any elements relevant to an analysis of fraudulence.  *Id.* at 371–73.  However, the Fifth Circuit articulated that other terms, such as "injured person" in subsection (b), should be interpreted broadly, thereby permitting the maximum number of plaintiffs in Chapter 12 cases to seek damages.[34]  *Id.* at 372–73.  The Fifth Circuit therefore expressed an expansive definitional policy in order to combat the "public harm" at the root of Chapter 12 cases.  The Fifth Circuit summarized this harm as follows:

> The filing of fraudulent liens undermines the reliability of the public records system on which so many rely, including land owners, purchasers, local governments, title companies, insurers, and realtors.  Fraudulent liens increase transaction costs for all market participants, even if harm to particular individuals is not readily discernable.  As the Legislature has found, fraudulent liens have "clogged the changes of commerce."

*Id.*

---

[34] The Court wants to emphasize that any reference to Chapter 12 in this Memorandum Opinion is **not** a reference to Chapter 12 of the Bankruptcy Code regarding family farmers.

Thus, in the absence of a clear definition of "fraudulent" in either the Texas Civil Practice & Remedies Code, *or* in case law interpreting it,[35] this Court will apply a definition that addresses the "public harm" identified by the Fifth Circuit. Here, the Tax Transfer Deeds of Trust were, in fact, executed in accordance with the Transfer Tax Lien Statutes (i.e., sections 32.06 and 32.065 of the Texas Tax Code). The *purpose* of these liens, however, was far from valid. The Debtor and his co-conspirators utilized the Tax Transfer Deeds of Trust with the intent that the obligations to repay the tax loans that those deeds of trust secured would be deliberately defaulted upon in order to allow for foreclosure of the properties, which would result in a stripping of the Plaintiffs' liens. Thus, the Debtor and his co-conspirators were able to sell the Countrywide Property, the Chase Property, and the WMC Property free and clear of both the tax liens and the preexisting mortgages and then abscond with the proceeds from the sales. Consequently, even if mechanically permissible, the overarching effect of the liens was harmful—the creation of the liens undermined the reliability of the public records system and increased transaction costs for all market participants in general and certainly for the Plaintiffs in particular. *See Vanderbilt Mortg. & Finance, Inc.*, 692 F.3d at 373. The Court therefore concludes that the Tax Transfer Deeds of Trust were "fraudulent" under Chapter 12 because they were created with a fraudulent purpose and resulted in "public harm."

Moreover, the Tax Transfer Deeds of Trust were filed with the Debtor's knowledge that they were fraudulent. At the outset, the Debtor and his co-conspirators intended to abscond with

---

[35] *In Kramer v. Fed. Nat'l Mortg. Ass'n*, No. A-12-CA-276-SS, 2012 U.S. Dist. LEXIS 105878 (W.D. Tex. May 15, 2012), the court found that because the lien was made with "proper authority," the plaintiffs could not satisfy the first element of TEX. CIV. PRAC. & REM. CODE § 12.002(a). The lien was, therefore, *not* fraudulent. However, the court failed to articulate a definition of "fraudulent", and the court did not discuss any "public harm" that resulted from the lien. Similarly, in *Brown v. Estate of Anderson*, No. 13-10-463-CV, 2011 Tex. App. LEXIS 6087 (Tex. App. Aug. 4, 2011), the movants argued that the respondents had failed to prove that the lis pendens at issue were "fraudulent" liens. However, again, the court failed to provide a definition of "fraudulent." Instead, the court simply concluded that liens at issue were fraudulent because, by filing a lis pendens, the movants *intended* to create a lien despite the fact that a lis pendens *cannot* create a lien.

the funds from the foreclosure sales.  Thus, the Court concludes that the Plaintiffs have satisfied the first element of TEX. CIV. PRAC. & REM. CODE § 12.002(a)—the Debtor knew that the Tax Transfer Deeds of Trust were fraudulent.

>        *b.   The Debtor intended that the WCL and Dampkring Dees of Trust be given legal*
>             *effect*

The Debtor has argued that his actions in creating and foreclosing on the Tax Transfer Deeds of Trust were lawful and that he and his co-conspirators were simply making wise business decisions in choosing to foreclose on the Countrywide Property, the Chase Property, and the WMC Property.  In making such an admission, the Debtor makes clear to this Court that he intended for the Tax Transfer Deeds of Trust to have legal effect.  This admission therefore satisfies the second element under TEX. CIV. PRAC. & REM. CODE § 12.002(a).

>        *c.   The Debtor intended to cause financial injury to the Plaintiffs*

The Debtor's role in the scheme is strong evidence of his intent to cause financial injury to the Plaintiffs.  Rather than using the language that he employed from 2004 through 2006 in the Cowin Deeds of Trust (i.e., the nineteen tax transfer loans made in his own name), the Debtor altered the language in the WCL and Dampkring Deeds of Trust, deliberately omitting the direction to disburse "any amounts required by law to be paid before payment to Grantor," which would have directed the excess proceeds to the preexisting lienholders (i.e., the Plaintiffs). [Finding of Fact No. 33].  The Court concludes that the Debtor intentionally altered the language in the WCL and Dampkring Deeds of Trust for the purpose of directing excess proceeds from foreclosure sales conducted pursuant to those deeds of trust to entities controlled by Allan Groves.  Thus, the Court finds that the Debtor intended to cause financial injury to the Plaintiffs.

According to the Fifth Circuit, actual injury to the Plaintiffs is not necessary to sustain a cause of action under Chapter 12.  *Vanderbilt Mortg. & Finance, Inc.*, 692 F.3d at 372 ("The

district court did not err in holding that the plaintiffs need not show actual damages to recover under Chapter 12."). Nevertheless, here it is clear that the Debtor's intentional acts in altering the language of the WCL and Dampkring Deeds of Trust did result in actual damages to the Plaintiffs—i.e., the theft of $276,489.00 in excess proceeds. [Finding of Fact Nos. 18, 23 & 29]. But for the altered language in the WCL and Dampkring Deeds of Trust, these funds would have been distributed to the preexisting lienholders (i.e., the Plaintiffs). [Finding of Fact No. 33]. Thus, the Court concludes that the Plaintiffs have satisfied the third element under TEX. CIV. PRAC. & REM. CODE § 12.002(a).

In sum, the Plaintiffs have demonstrated by a preponderance of the evidence that the Debtor knew that the Tax Transfer Deeds of Trust were fraudulent liens on real property; that the Debtor intended that the Tax Transfer Deeds of Trust be given the same legal effect as a court record or document of a court evidencing a valid lien or claim against real property or an interest in real property; and that the Debtor intended to cause—and in fact, did cause—financial injury to the Plaintiffs. *See id.* § 12.002(a)(1)-(3). Accordingly, the Plaintiffs are each entitled to actual damages caused by the violations, as these damages are greater than the $10,000 permitted by the statute,[36] as well as court costs, reasonable attorneys' fees, and exemplary damages. *Id.* § 12.002(b).

### 4. Texas Uniform Fraudulent Transfer Act (TUFTA)

Finally, the Plaintiffs allege that the Debtor and his co-conspirators created and foreclosed the Tax Transfer Deeds of Trust on the Countrywide Property, the WMC Property, and the Chase Property in violation of the TUFTA. The TUFTA, in relevant part, provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor

---

[36] The actual damages total $276,489.00 ($99,927.13 to Countrywide/Deutsche Bank, $58,300.86 to WMC, and $118,261.01 to Chase/Wells Fargo). [Finding of Fact Nos. 18, 23 & 29].

made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor. TEX. BUS. & COM. CODE § 24.005(a). "The purpose of TUFTA is to prevent debtors from defrauding creditors by placing assets beyond their reach." *Mladenka v. Mladenka*, 130 S.W.3d 397, 404 (Tex. App. 2004) (citing *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App. 2002)). "A plaintiff must satisfy three elements to establish a claim under TUFTA: (1) a debtor-creditor relationship must exist between the parties; (2) the debtor must have incurred an obligation; and (3) the debtor must have incurred the obligation with the actual intent to hinder, delay, or defraud the creditor." *BAC Home Loans Servicing, LP*, 2012 U.S. Dist. LEXIS 140373, at *69–70. The burden is on the creditor to prove these elements by a preponderance of the evidence. *Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App. 2007).

### a.  A debtor-creditor relationship exists between the Plaintiffs and the Debtor

The definitions of "creditor" and "debtor" under the TUFTA mirror the definitions of "creditor" and "debtor" in the Bankruptcy Code. As this Court has previously concluded in this Opinion, the Plaintiffs are creditors within the meaning of the Bankruptcy Code, and therefore are creditors under the TUFTA, because they have claims to the excess proceeds resulting from the foreclosure sales. This Court has also concluded in section C., *supra*, that the Debtor is a debtor pursuant to the Bankruptcy Code, and therefore he is also a debtor under the TUFTA because he is liable to the Plaintiffs for the aggregate amounts of the excess proceeds from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property.

### b.  The Debtor incurred an obligation to repay the tax transfer loans

The TUFTA does not define the term "obligation"; therefore, the term will be construed according to its "plain and common meaning." *Harris County Hosp. Dist. v. Tomball Regional*

*Hosp.*, 283 S.W. 3d 838, 842 (Tex. 2009).  Black's Law Dictionary defines "obligation" as "[a] legal relationship in which one person, the obligor, is bound to render a performance in favor of another, the obligee."  BLACK'S LAW DICTIONARY 1179 (9th ed. 2009); see also TEX. BUS. & COM. CODE § 24.007(5)(B) (providing that an obligation is incurred "when the writing executed by the obligor is delivered to or for the benefit of the obligee.").  Nancy Groves and TRH, which was controlled by Allan Groves, fall within this definition because they incurred obligations to repay the tax transfer loans granted by WCL and Dampkring.  As a member of the conspiracy, the Debtor also falls within the definition of an "obligor," since the obligations were incurred in furtherance of the conspiracy.  *See Akin*, 661 S.W.2d at 921 (noting that, once a conspiracy is found, each co-conspirator may be held liable for acts taken by the other co-conspirators in furtherance of the conspiracy).

       *c.   The obligations were incurred with the actual intent to defraud the Plaintiffs*

     "The intent required under TUFTA is simply the intent to hinder, delay or defraud a creditor by putting assets beyond that creditor's reach."  *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009) (citing *In re Reed*, 700 F. 2d 986, 991 (5th Cir. 1983)).  "Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent."  *Roland v. United States*, 838 F.2d 1400, 1402–03 (5th Cir. 1988).  The TUFTA includes a list of "badges of fraud" to assist courts in determining whether an obligation was incurred with the intent to hinder, delay, or defraud creditors.  *See* TEX. BUS. & COM. CODE § 24.005(b).  However, this list is non-exhaustive and the court may consider "other factors" relevant to the issue of whether actual intent to defraud existed.  *Id.*

Here, the conspiracy itself, and the Debtor's central role in this conspiracy, is evidence of the Debtor's intent to defraud the Plaintiffs. *See BAC Home Loan Servicing, LP*, 2012 U.S. Dist. LEXIS 140373, at *74 (citing *S.E.C. v. Res. Dev. Int'l*, 487 F.3d 295, 302 (5th Cir. 2007) (holding that evidence that the defendant operated to facilitate a Ponzi scheme alone established the defendant's actual intent to defraud the creditor)); *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (noting that "the general chronology of events and transactions under inquiry" might evidence a transfer made with intent to defraud). Although the obligations were not incurred strictly between insiders as defined in section 24.002(7) of the Texas Business and Commercial Code,[37] it is relevant that the obligations to repay the tax transfer loans were incurred between entities controlled by Allan Groves (a long-time close personal friend of the Debtor), his ex-wife Nancy Groves, and entities controlled by the Debtor. *See, e.g., Pace v. Nelson Hensley & Consol. Fund Mgmt., L.L.C.*, 456 B.R. 253, 267 (Bankr. W.D. Tex. 2011) ("While the transfer was not strictly to an insider as that term is defined by the Bankruptcy Code, the transfer was to a close, long-time friend and attorney of [the debtor]"); TEX. BUS. & COM. CODE § 24.005(b)(1) ("[I]n determining actual intent [to defraud], consideration may be given, among other factors, to whether:  (1) the transfer or obligation was to an insider"); *In re Soza,* 542 F.3d at 1067 (listing "the family, friendship or close associate relationship between the parties" as relevant to determining whether a transfer was made or obligation was incurred with the intent to defraud). Here, the fact that the obligations were incurred by and between members of the conspiracy is relevant.

---

[37] Section 24.002(7) provides that, in the case of an individual debtor, "insider" includes:
> (i) a relative of the debtor or of a general partner of the debtor;
> (ii) a partnership in which the debtor is a general partner;
> (iii) a general partner in a partnership described in Subparagraph (ii) of this paragraph; or
> (iv) a corporation of which the debtor is a director, officer, or person in control.

Also indicative of the Debtor's intent to defraud the Plaintiffs is the fact that the Debtor changed the language in the WCL and Dampkring Deeds of Trust to omit the direction to pay "any amounts required by law to be paid before payment to Grantor," whereas the Cowin Deeds of Trust had included this language.  [Finding of Fact No 33].  This deviation from the Debtor's prior business practice is evidence that he intended to defraud the Plaintiffs out of the excess proceeds from the foreclosure sales.  Also relevant is the fact that, in granting the tax transfer loans on the Countrywide Property, the Chase Property, and the WMC Property, the Debtor did not take into account Nancy Groves' or TRH's abilities to repay.  [Finding of Fact No. 35]; [Sept. 15, 2011 Tr. at 88:5–25; 96:22–97:20].  The Debtor himself admitted that the way to make money off of granting tax transfer loans is to hold the loans and collect interest on the amount borrowed [*Id.* at 68:21–69:7]; thus, the fact that he did not consider whether the borrowers would ever be able to repay the tax transfer loans indicates that the Debtor and his co-conspirators never intended for the loans to be repaid.  Further, the large number of tax liens defaulted on and foreclosed upon in such a short period of time indicates that the liens were created with the intent to defraud the Plaintiffs.  *See* [Finding of Fact Nos. 8 & 9] (finding that seven of eleven tax transfer loans granted by WCL and eleven of fifteen tax transfer loans granted by Dampkring involved foreclosures); *See, e.g., Tel. Equip Network, Inc.*, 80 S.W. 3d at 609 (holding that evidence that a debtor defaulted on an obligation shortly after completing the transaction was significant and suggestive of an actual intent to defraud the creditor).  Thus, the Court finds that the circumstances surrounding the creation and foreclosure of the Tax Transfer Deeds of Trust liens on the Countrywide Property, the WMC Property, and the Chase Property present sufficient "badges of fraud" to indicate that the Debtor and his co-conspirators incurred the obligations with the intent to defraud the Plaintiffs.

In conclusion, the Plaintiffs have proven the elements of the TUFTA by a preponderance of the evidence.  Although the TUFTA provides for the remedies of avoidance of the obligations or attachment against the property [TEX. BUS. & COM. CODE §§ 24.008(1) & (2)], these remedies would come too late to offer any relief for the Plaintiffs in the instant disputes.  Therefore, the Court finds that monetary damages are the appropriate remedy.  *See id.* § 24.008(3)(c) ("In an action for relief against a transfer or obligation under this chapter, a creditor . . . may obtain: . . . any other relief the circumstances may require.").  Thus, the TUFTA provides an alternate ground for the actual damages award in the total aggregate amount of $276,489.00 ($99,927.13 to Countrywide/Deutsche Bank, $58,300.86 to WMC, and $118,261.01 to Chase/Wells Fargo). [Finding of Fact Nos. 18, 23 & 29].

5.  Judgment and Amount

a.    *Actual and statutory damages*

For the reasons discussed above, this Court has found that the Debtor violated the TTLA, Chapter 12 of the Texas Civil Practice and Remedies Code, and the TUFTA.  Therefore, the Plaintiffs are entitled to damages to compensate them for these violations.  This Court awards actual damages to Countrywide/Deutsche Bank in the total amount of $99,927.13; actual damages to WMC in the total amount of $58,300.86; and actual damages to Chase/Wells Fargo in the total amount of $118,261.01, representing the amount of the excess proceeds to which they were entitled from the foreclosure sales of the Countrywide Property, the WMC Property, and the Chase Property.  The Court also awards each of the Plaintiffs the maximum amount of additional statutory damages permitted under the TTLA of $1,000.00 per theft.

b.  *Prejudgment interest*

66

"Under Texas law, prejudgment interest may be awarded if either the 'general principles of equity' or an 'enabling statute' allow such an award." *West v. Hsu (In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 685 (Bankr. S.D. Tex. 2009) (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1997)). One of the justifications for awarding prejudgment interest is to "put a plaintiff in the position he would have been in had he had his trial and recovered his judgment immediately after his injury." *Reyes-Mata v. IBP, Inc.*, 299 F.3d 504, 507 (5th Cir. 2002). Here, the Debtor's actions have wrongfully deprived the Plaintiffs of the use of $276,489.00 since those funds were taken in 2007 (i.e., the year the foreclosure sales took place). In the interim time, the Plaintiffs could have "invested or made other prudent use of these funds." *See HEI Res. East OMG Joint Venture v. S. Lavon Evans, Jr. Operating Co., Inc.*, Civil Action No. 5:07-CV-62, 2010 U.S. Dist. LEXIS 11841, at *21 (S.D. Tex. Feb. 10, 2010). Although there is no applicable enabling statute, here, the Court awards the Plaintiffs prejudgment interest on an equitable basis in order to make them whole.

Under Texas law, "prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Johnson & Higgins of Texas, Inc.*, 962 S.W.2d at 531. "Prejudgment interest is calculated up to the date of judgment and is then included as part of the final judgment." *Dallas County v. Crestview Corners Car Wash*, 370 S.W.3d 25, 50 (Tex. App. 2012) (citing *Sisters of Charity of Incarnate Word v. Dunsmoor*, 832 S.W.2d 112, 119 (Tex. App. 1992)). In the absence of an applicable pre-judgment interest statute, this Court will apply the prejudgment interest approach set forth in section 304.101 *et seq.* of the Texas Finance Code. *See Johnson & Higgins of Texas, Inc.*, 962 S.W.2d at 530–31 (dealing with the predecessor statute to section 304.101 *et seq.* of the Texas Finance Code). Under section 304.103 of the Texas Finance Code, prejudgment interest accrues

67

at the same rate as post-judgment interest.  At the time of this judgment, post-judgment interest accrues at a rate of five percent.[38]

Thus, the Court will award five percent (5%) simple interest on the total actual damages amounts of $99,927.13 awarded to Countrywide/Deutsche Bank, $58,300.86 awarded to WMC, and $118,261.01 awarded to Chase/Wells Fargo from November 10, 2010 (i.e., the date the adversary proceedings were filed) to April 24, 2013.[39]  Using the formula for simple interest amount = (P)(r)(y), where P equals principal, r equals interest rate, and y equals the number of years (calculated as number of days/365, here 896/365 = 2.455), as of April 24, 2013, the total amount of prejudgment interest owed to Countrywide/Deutsche Bank is $12,266.05, the total amount of prejudgment interest owed to WMC is $7,156.43, and the total amount of prejudgment interest owed to Chase/Wells Fargo is $14,516.54.

   c.   *Costs and attorneys' fees*

Finally, the Court awards each of the Plaintiffs court costs and reasonable and necessary attorneys' fees, which are allowed pursuant to the TTLA and Chapter 12 of the Texas Civil Practice and Remedies Code.  A separate hearing on the amount of these costs and fees will be held shortly hereafter.

---

[38] Specifically, subsection (c) of section 304.003 of the Texas Finance Code provides that the postjudgment interest rate is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation."  TEX. FIN. CODE ANN. § 304.003(c)(1).  However, where the prime rate is less than five percent, subsection (c) provides that the judgment rate shall be set at five percent.  *Id.* § 304.003(c)(2).  The current prime rate is 3.25 percent [Federal Reserve Statistical Release, H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/H15/Current/ (last visited April 22, 2013)]; thus, pursuant to section 304.003(c)(2) of the Texas Finance Code, this Court will apply a five percent interest rate to the prejudgment damages award.

[39] Prejudgment interest will continue to accrue on the actual damages awards until the judgments are entered.  These judgments will be entered as soon as this Court holds a hearing on the amount of reasonable costs and attorneys' fees to be awarded to each of the Plaintiffs.  At that time, the Court will calculate the additional amounts of prejudgment interest on the actual and statutory damages to be awarded to each of the Plaintiffs and include these amounts in the total amount to be awarded in each of the judgments.  In accordance with Texas case law, prejudgment interest will not be awarded on costs and attorneys' fees.  *See, e.g., C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 325 (Tex. 1994).

     *d.  Post-judgment interest*

"Postjudgment interest then begins to accrue on the entire amount of the final judgment (including court costs and prejudgment interest) from the date of the judgment until paid." *Dallas County*, 370 S.W.3d at 50; TEX. FIN. CODE ANN. § 304.005(a).  Section 304.003 of the Texas Finance Code applies here because this is a money judgment, other than a judgment on a contract.  Thus, in compliance with the statute, this Court will award five percent (5%) simple interest[40] on:  (1) the total amount of the judgment (comprised of actual damages, statutory damages, prejudgment interest, court costs, and attorneys' fees) awarded to Countrywide/Deutsche Bank; (2) the total amount of the judgment, including court costs and attorneys' fees, awarded to WMC; and (3) the total amount of the judgment, including court costs and attorneys' fees, awarded to Chase/Wells Fargo.  This Court will hold a hearing to determine the amount of court costs and reasonable attorneys' fees to be awarded to each of the Plaintiffs, and then include these costs and fees into the total judgment amount to be awarded to each Plaintiff.  Post-judgment interest will then be awarded on each of the three total judgment amounts.

## D.  Burden of Proof to Demonstrate Non-dischargeability Under Section 523 of the Code

     Having determined that the Debtor does, indeed, owe debts to the Plaintiffs, the Court must now determine whether these debts are dischargeable.  In an adversary proceeding to determine the dischargeability of a debt, the plaintiff bears the burden of proving the elements by a preponderance of the evidence.  *Grogan*, 498 U.S. at 286; *Tower Credit, Inc. v. Gauthier*, 349 F. App'x 943, 945 (5th Cir. 2009); Fed. R. Bankr. P. 4005.  "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the Debtor may be afforded a fresh

---

[40] *See* footnote 38 for a discussion of how the interest rate was determined.

start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson),* 107 F.3d 355, 356 (5th Cir. 1997). However, the Bankruptcy Code affords relief only to the "honest but unfortunate debtor," and an individual may not obtain a discharge of debts incurred through his own wrongful conduct. *Grogan*, 498 U.S. at 286; *In re Borschow*, 467 B.R. 410, 417 (Bankr. W.D. Tex. 2012).

Finally, the Court analyzes the section 523(a) causes of action brought by the Plaintiffs with one eye cocked on the Fifth Circuit's opinion of *M.M. Winkler. Deodati v. M.M. Winkler & Assocs. (In the Matter of M.M. Winkler)*, 239 F.3d 746 (5th Cir. 2001). In that case, the Fifth Circuit stated that "[w]e conclude that if a debt arises from fraud and the debtor is liable for that debt under state partnership law, the debt is nondischargeable under § 523(a)(2)(A)." *Id.* at 751. Stated differently, the Fifth Circuit held that an individual debtor whose partner committed fraud cannot obtain a discharge under section 523(a)(2)(A), as the defrauding partner's acts are imputed to the "innocent" partner/debtor. *Id.* Logic dictates that if state partnership law can bar discharge due to imputing bad acts to the debtor, then state law on conspiracy can do the same. Moreover, in *M.M. Winkler*, the Fifth Circuit expressly held that, with respect to section 523(a)(2), the plaintiff-creditor did not need to prove that the "innocent" partner/debtor received any benefit from the acts of the defrauding partner. *Id.* at 749. Logic also dictates that this Court should apply this rule to the causes of action brought here, unless applicable law on section 523(a)(4) and (a)(6) states otherwise.

**E. The Plaintiffs Have Met their Burden of Demonstrating Larceny Pursuant to Section 523(a)(4) of the Code, and therefore the Debts are Nondischargeable Under this Particular Provision**

11 U.S.C. § 523(a)(4) states that a debt may be nondischargeable "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Here, the Plaintiffs assert that the Debtor's actions constitute larceny and/or embezzlement [Adv. No. 10-03583;

Doc. No. 41; p. 12]; [Adv. No. 10-03584, Doc. No. 51, p. 13]; [Adv. No. 10-03585, Doc. No. 58, p. 12]; they do not plead defalcation while acting in a fiduciary capacity.  As the phrase "while acting in a fiduciary capacity" does not qualify "embezzlement" or "larceny," there is no requirement that the Plaintiffs demonstrate that the Debtor was acting in a fiduciary capacity.  4-523 COLLIER ON BANKRUPTCY ¶ 523.10[2][d].  Federal law, rather than state law, controls the meaning of "larceny" and "embezzlement" under section 523(a)(4).  *Smith v. Hayden (In re Hayden)*, 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000) (citing *Clarendon Ins. Co. v. Barrett (In re Barrett)*, 156 B.R. 529, 533 (Bankr. N.D. Tex. 1993)); *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

    1.  Elements of Larceny under Section 523(a)(4)

Under federal common law, larceny is the "felonious taking of another's personal property with intent to convert it or deprive the owner of same."  4-523 COLLIER ON BANKRUPTCY ¶ 523.10[2] (citing *In re Smith*, 253 F.3d 703 (5th Cir. 2001) (not for publication); *In re Rose*, 934 F.2d 901 (7th Cir. 1991)).  Similarly, bankruptcy courts have defined the elements of "larceny" as: (1) "the fraudulent and wrongful taking away of the property of another;" with (2) "the intent to convert it to the taker's use and with intent to permanently deprive that owner of such property."  *Nibbi v. Kilroy (In re Kilroy)*, 357 B.R. 411, 431 (Bankr. S.D. Tex. 2006) (citing *In re Hayden*, 248 B.R. at 525).  Black's Law Dictionary defines "felonious" as "proceeding from an evil heart or purpose; malicious; villainous."  BLACK'S LAW DICTIONARY 633 (7th ed. 1999).  Further, "fraudulent" is defined as "conduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude."  *Id.* at 672.  The term "wrongful" is "characterized by unfairness or injustice."  *Id.* at 1606.

    2.  Application of the Facts in the Instant Disputes to Larceny under Section 523(a)(4)

Set forth below is an analysis of each element necessary for a conclusion that the Debtor committed larceny under section 523(a)(4).

(1) *"The fraudulent and wrongful taking away of the property of another."* As discussed previously in this Opinion, the Plaintiffs had liens on the excess proceeds resulting from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property. *See supra* section C.2.a. Instead of paying the excess proceeds to the Plaintiffs, as Texas law required them to do, the Debtor and his co-conspirators are responsible for diverting those proceeds to themselves, and absconding with them. Therefore, it has been established that the Debtor and his co-conspirators took away the property of the Plaintiffs. However, this element requires not only the taking of another's property, but that the taking is accompanied by an evil purpose, involving bad faith and unfairness. The following facts lead this Court to find that the Debtor and his co-conspirators fraudulently and wrongfully took the property of the Plaintiffs:

a. *Willful omissions from WCL and Dampkring Deeds of Trust.* The first fact that leads to the finding that the takings were wrongful and in bad faith is the difference between the language in the Cowin Deeds of Trust, which were prepared before the conspiracy began, and the language in the WCL and Dampkring Deeds of Trust. *Compare* [Ex. Nos. 1–19] *with* [Ex. Nos. 21–31 & 52–66]. Importantly, the WCL and Dampkring Deeds of Trust were missing the instruction to distribute "any amounts required by law to be paid before payment to Grantor," which would have directed payment to the preexisting lienholders (i.e., the Plaintiffs). [Finding of Fact No. 33]. This Court has found that the Debtor was responsible for preparing the WCL and

Dampkring Deeds of Trust [Finding of Fact No. 33], and that the Debtor intentionally omitted this language so as to divert the excess proceeds to entities controlled by his co-conspirator, Allan Groves. Thus, the Court finds that this fact weighs in favor of finding that the taking of the excess proceeds was fraudulent and wrongful.

b. *WCL and Dampkring loans to Nancy Groves and Perc were made without consideration of ability to repay.* As the Debtor himself testified, the primary way to make money off of tax transfer loans is to hold the loans and collect interest from the borrowers. [Sept. 15, 2011 Tr. 68:21–69:7]. Yet, with regards to the WCL and Dampkring tax transfer loans made to Perc and Nancy Groves, the Debtor admitted that there was no underwriting process involved to determine creditworthiness or ability to repay. [Finding of Fact No. 35]; [Sept. 15, 2011 Tr. 88:5–25; 96:22–97:20]. This Court has found that the Debtor did not take into account the borrowers' abilities to repay because the conspirators did not intend for the loans to be repaid. Rather, they intended that the loans would not be repaid, thus enabling the Debtor, through his companies WCL and Dampkring, to foreclose under the Tax Transfer Deeds of Trust, strip the Plaintiffs' liens, and divert the proceeds to entities controlled by Allan Groves. These circumstances indicate that the taking of the excess proceeds was fraudulent and wrongful.

c. *The number of foreclosures in a short time period.* While only three of the preexisting lienholders have brought complaints to determine dischargeability, the amount of times that this foreclosure scheme was executed between April

20, 2007 and August 27, 2007 is indicative of the Debtor's illicit purpose in orchestrating these foreclosures. Specifically, of eleven tax transfer loans granted by WCL, seven involved foreclosures, [Finding of Fact No. 8]; *see also* [Ex. Nos. 32, 34, 36, 38, 40, 42, & 44], and of fifteen tax transfer loans granted by Dampkring, eleven involved foreclosures. [Finding of Fact No. 9]; [Ex. Nos. 67, 69, 71, 73, 75, 77, 79, 81, 83, 85 & 87]. The Court finds that these circumstances weigh in favor of finding that the taking of the excess proceeds was fraudulent and wrongful.

d. *Use of the excess proceeds.* The excess proceeds resulting from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property were never paid to the Plaintiffs. Instead, Matherne deposited the proceeds with either Perc or TRH (entities controlled by his co-conspirator, Allan Groves). [Finding of Fact No. 36]. Kerness (i.e., the nominal head of Perc and TRH) then disbursed these funds according to Allan Groves' instructions. [Finding of Fact No. 37]. In total, Kerness estimated that he delivered at least half a million dollars to Allan Groves and tens of thousands of dollars to Nancy Groves. [Finding of Fact No. 37]. The Court finds that these circumstances also weigh in favor of finding that the taking of the excess proceeds was fraudulent and wrongful.

This Court thus finds that this element of section 523(a)(4) in regards to larceny is satisfied.

(2) *"[W]ith intent to convert it or deprive the owner of the same."* The structure of the conspiracy as discussed throughout this Opinion shows that the Debtor and his co-

conspirators acted purposefully and intentionally to deprive the Plaintiffs of their liens on the Countrywide Property, the Chase Property, and the WMC Property, as well as their liens on the excess proceeds resulting from the foreclosure sales of those properties.   In short, the scheme was carried out with the ultimate intent of absconding with the excess proceeds from the foreclosure sales.

3. Conclusion on Larceny under Section 523(a)(4)

For the reasons set forth above, the Court finds that each of the debts that the Debtor owes to the Plaintiffs arose from the Debtor's larceny.   Because these debts resulted from larceny, they are nondischargeable pursuant to section 523(a)(4).

**F.  The Plaintiffs Have Failed to Demonstrate Embezzlement Pursuant to Section 523(a)(4) of the Code, and therefore the Debts Cannot be Deemed Nondischargeable Under this Particular Provision**

"Embezzlement" is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *In re Powers*, 261 F. App'x at 723 (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)).  Embezzlement differs from larceny in terms of timing.  The distinction, as this Court has noted in a prior opinion, is that "[l]arceny applies when the Debtor unlawfully appropriates the property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care."  *VGM Fin. Servs. v. Ruggiero (In re Ruggiero)*, 388 B.R. 784, 793 (Bankr. S.D. Tex. 2008).  Bankruptcy courts look to the following elements to establish embezzlement:  "(1) the Debtor appropriated funds, (2) the appropriation was for the Debtor's use or benefit, and (3) the Debtor did the appropriation with fraudulent intent."  *In re Hayden*, 248 B.R. at 525; *Guerriero v. Kilroy (In re Kilroy)*, 354 B.R. 476, 494

(Bank. S.D. Tex. 2006); *Rogers v. Funk/Hansard, Inc. (In re Funk/Hasard)*, 1984 WL 6609, at

*7 (M.D. Ga. July 27, 1984); *Skemp v. Michel (In re Michel)*, 74 B.R. 88, 90 (N.D. Ohio 1986).

1. Application of the Facts in the Instant Disputes to Embezzlement under Section 523(a)(4)

(i) *"The Debtor appropriated funds*."  "Appropriation" is defined as "the exercise of control over property; a taking of possession."  BLACK'S LAW DICTIONARY 98 (7th ed. 1999).  In connection with its analysis under the TTLA in section C.2.b., *supra*, this Court has determined that the Debtor appropriated the excess proceeds from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property that rightfully belonged to the Plaintiffs.  Not only did the Debtor control the disposition of the excess proceeds via the WCL and Dampkring Deeds of Trust, but he ensured that the proceeds were deposited to Perc and TRH, entities controlled by his co-conspirator Allan Groves.  Thus, the first element is satisfied.

(ii) *"The appropriation was for the Debtor's use or benefit*."  This element does *not* require a showing that the Debtor himself personally benefitted by the amounts that the Plaintiffs were damaged.  For example, in affirming a bankruptcy court's decision that a debt was non-dischargeable due to embezzlement under section 523(a)(4), the Sixth Circuit stated:

> In an argument similar to his denial that he obtained money under false pretenses, debtor asserts that he did not embezzle under section 523(a)(4) because the Bankruptcy Court did not find that he appropriated funds for his own benefit. As noted, however, the Bankruptcy Court found that debtor secretly took funds constituting part of creditor's individual share of the sale proceeds from an account held jointly by creditor and debtor and transferred those funds to a corporation controlled by debtor. Even if debtor did not deposit the $40,000 directly into his own account, he disregarded creditor's wishes

concerning the proper disbursal of the funds and instead used the money to improve the finances of a corporation which he controlled and of which he was the president. We therefore reject the implication by debtor that the "appropriation" requirement for embezzlement under section 523(a)(4) demands a showing that the debtor individually profited in an amount equal to that lost by the creditor. Regardless of whether debtor elected to deposit the property of creditor into his own bank account or into the account of his corporation, debtor fraudulently appropriated the property for his own use.

*In re Brady*, 101 F.3d 1165, 1173 (6th Cir. 1997) (citations omitted).

Similarly here, although there is nothing in the record to show that the Debtor himself actually received any of the excess proceeds from Perc or TRH, the evidence shows that the Debtor was responsible for directing these proceeds to Perc and TRH through the language in the WCL and Dampkring Deeds of Trust [Finding of Fact No. 33] and his instructions to Matherne (i.e., the Trustee) to follow the language in the WCL and Dampkring Deeds of Trust when distributing any proceeds from foreclosure sales. [Finding of Fact No. 36]. Here, as in *Brady*, the Plaintiffs are not required to show that the Debtor himself profited by the amounts that the Plaintiffs lost. Rather, the facts that the Debtor directed the excess proceeds to companies controlled by his co-conspirator, Allan Groves, and that his co-conspirators Allan Groves and Nancy Groves received, at the very least, over half a million dollars in excess proceeds from Perc and TRH [Finding of Fact No. 37] are sufficient to show that the appropriation was for the Debtor's benefit.

(iii) "*The Debtor appropriated the funds with fraudulent intent*." Finally, to be liable for embezzlement, the Debtor must have appropriated the funds with fraudulent intent. Fraudulent intent is "an intent to deceive another person

and thereby induce such other person to transfer, alter or terminate a right with respect to property." *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *Id.* (quoting *In re Harrell*, 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988)).

Here, the Debtor and his co-conspirators made no representations at all to the Plaintiffs.  In fact, in their supplemental trial brief, the Plaintiffs "concede no direct representations were made by Cowin to Plaintiffs or that Plaintiffs relied upon such representations of Cowin."  [Adv. No. 10-03583,  Doc. No. 45, p. 6].  Because neither the Debtor nor any of his co-conspirators made any misrepresentations to the Plaintiffs, the Court finds that the Debtor lacked the requisite intent to deceive the Plaintiffs or to induce them, "in reliance upon the deception to assume, create, transfer, alter or terminate a right or obligation with reference to property." *First National Bank of Midlothian v. Harrell (In re Harrell)*, 94 B.R. 86, 918 (Bankr. W.D. Tex. 1988).  Therefore, the Plaintiffs fail on the third element of embezzlement under section 523(a)(4).

### 2.  Conclusion on Embezzlement under Section 523(a)(4)

The Plaintiffs have failed to establish any misrepresentation or inducement on the part of the Debtor and his co-conspirators, and never entrusted their property to the Debtor's care. Therefore, they cannot succeed with their argument that the debts owed by the Debtor should be non-dischargeable because they resulted from embezzlement pursuant to section 523(a)(4) of the Code.

**G. The Plaintiffs Have Met their Burden of Demonstrating Willful and Malicious Injury Pursuant to Section 523(a)(6) of the Code, and therefore the Debts are Nondischargeable Under this Particular Provision**

The United States Supreme Court has established guidelines for determining whether a debt arises from "willful and malicious injury" under section 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998). In *Kawaauhau*, the Court held that section 523(a)(6) does not except from discharge debts arising from negligently inflicted injury. *Id.* Rather, it applies only to "acts done with the actual intent to cause injury," and excludes intentional acts that merely happen to cause injury. *Id.* at 61. "Willful," as used in the provision, "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely . . . a deliberate or intentional *act* that leads to injury." *Id.* The Supreme Court also noted that the language of section 523(a)(6) mirrors the definition of an intentional tort, which requires that an actor "intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* at 61–62. In applying the Supreme Court's ruling, the Fifth Circuit has held that "for a debt to be nondischargeable, a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury." *In re Williams*, 337 F.3d 504, 508–9 (5th Cir. 2003).

Further, as to the "malicious injury" requirement of section 523(a)(6), the Fifth Circuit has held that the word "malicious" creates an "implied malice standard." *In re Miller*, 156 F.3d at 605. A debtor acts with implied malice when he acts "with the actual intent to cause injury." *Id.* at 606. The test for willful and malicious injury under section 523(a)(6), therefore, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the Debtor. *Id.*

Finally, injuries covered under this section "are not confined to physical damage or destruction; an injury to intangible personal property or property rights is sufficient."   4-523

*Collier on Bankruptcy* ¶ 523.12[4].  "Thus, the conversion of another's property [or interest in property] without the owner's knowledge or consent, done intentionally and without justification and excuse, is a willful and malicious injury within the meaning of the exception."  *Id.* Additionally, "[i]n the context where a debtor has converted a creditor's collateral, it has been held . . .  that the 'wilfull' requirement of [section] 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights."  *In re Jones*, 276 B.R. 797, 802 (Bankr. N.D. Ohio 2001).

1. Application of the Facts in the Instant Disputes to Willful and Malicious Injury under Section 523(a)(6)

The Debtor's participation in the conspiracy resulted in willful and malicious injury to the Plaintiffs under section 523(a)(6).   First, the facts and circumstances surrounding the conspiracy itself indicate that the Debtor acted with the subjective motive to cause harm to the Plaintiffs' interests, and that, at the very least, there was an objective substantial certainty that harm would result.  The Debtor and his co-conspirators perpetrated a scheme involving the Transfer Tax Lien Statutes that was carried out substantially as follows: (1) one party purchased properties subject to first lien mortgages held by the Plaintiffs at foreclosure sales of a condominium associations' assessment liens; (2) that party then entered into sham agreements with the Debtor (acting through WCL and Dampkring) for the Debtor to pay the *ad valorem* taxes assessed against the properties in exchange for transfer tax liens against the properties; (3) the first party intentionally defaulted on the obligation to repay the loans, which resulted  in foreclosures under the Tax Transfer Deeds of Trust and sales of the property free and clear of the Plaintiffs' liens; and (4) the Debtor and his co-conspirators absconded with the excess proceeds

80

from the foreclosure sales.[41]   When the Tax Transfer Deeds of Trust were foreclosed, the Plaintiffs' liens automatically transferred from the real properties themselves to the excess proceeds generated by the foreclosure sales of those properties.  *Pearson v. Teddlie*, 235 S.W.2d at 759; *Diversified Mortg. Invs.*, 576 S.W.2d at 808.  Yet, the Debtor and his co-conspirators did not pay out the excess proceeds to the Plaintiffs (i.e., the junior lienholders) as required by Texas Law.  [Finding of Fact Nos. 18, 23, 29 & 37]; *supra* section C.2.a.  From these facts, the Court concludes that the Debtor acted with the subjective motive to cause harm to the Plaintiffs because the scheme was carried out for the very purpose of absconding with the proceeds from the foreclosure sales.  At the very least, it was objectively certain that harm would result to the Plaintiffs as a result of the Debtor and his co-conspirators' actions in furtherance of the conspiracy.

Further, the nature of the harm suffered by the Plaintiffs is the type of harm covered under section 523(a)(6).  As the bankruptcy court in *In re Jones* discussed, where, as here, a debtor has converted a creditor's collateral, two elements should be considered:  (1) whether the debtor knew of the creditor's lien rights; and (2) whether the debtor knew his conduct would cause injury to those rights.  *In re Jones*, 276 B.R. at 802.  As discussed *supra* in this Memorandum Opinion, the Debtor and his co-conspirators not only were put on notice, but had *actual knowledge* that there were preexisting lienholders on the Countrywide Property, the Chase Property, and the WMC Property.  [Finding of Fact Nos. 15, 20, 25, 31 & 36].  Additionally, because the Debtor and his co-conspirators knew that there were junior lienholders on the Countrywide Property, the Chase Property, and the WMC Property, they also knew that they

---

[41] Nothing in the record demonstrates that the Debtor himself actually received any of the excess proceeds from the foreclosures of the WMC Property, the Chase Property, or the Countrywide Property.  However, because the Debtor was a member of the conspiracy and other members of the conspiracy actually received the proceeds, the Debtor received a benefit from them.

were required by Texas law to distribute the excess proceeds from the foreclosure sales of those properties to the Plaintiffs (i.e., the junior lienholders).[42]  *See supra* section C.2.a.  By failing to distribute the excess proceeds from the foreclosure sales of the Countrywide Property, the Chase Property, and the WMC Property to the Plaintiffs, and instead diverting those proceeds to entities controlled by one of the co-conspirators, Allan Groves, the Debtor and his co-conspirators knew that their actions would result in injury to the Plaintiffs, whose liens on the Countrywide Property, the Chase Property, and the WMC Property had been stripped and who received no proceeds whatsoever from the foreclosure sales of those properties.

In sum, what happened here is really not much different than what happens in a standard garden variety "out of trust" sale by a debtor of a vehicle that secures the car loan:  when the debtor sells the car and spends the proceeds himself rather than turning over the proceeds to the vehicle lienholder, the Debtor has committed willful and malicious injury to the lienholders interests.  *Ford Motor Credit Co., LLC v. Franceschini (In re Franceschini*), 2012 Bankr. LEXIS 156 (Bankr. S.D. Tex. Jan. 12, 2012*); see also Theroux v. HSA Mortgage Co. (In re Theroux*), 1995 WL 103342, at *4 (5th Cir. Feb. 27, 1995) (finding that a mobile home dealer acted willfully and maliciously in withholding proceeds from secured lender when there was no evidence that he had an objectively reasonable belief that the money was not owed to the secured lender).   Just as the debtors in *Franceschini* and *Theroux* willfully and maliciously injured the lienholders by failing to remit the proceeds to them, so has the Debtor willfully and maliciously injured the Plaintiffs in the suits at bar.

3. Conclusion on Nondischargeability under Section 523(a)(6)

---

[42] While it is possible that exact names of the Plaintiffs were not actually known to the co-conspirators, the co-conspirators nevertheless knew that there were junior lienholders on the WMC Property, the Chase Property, and the Countrywide Property.  Further, since the original mortgages were all registered with MERS, the co-conspirators could have ascertained the Plaintiffs' identities and interests merely by contacting MERS.

The Plaintiffs have proven, by a preponderance of the evidence, that the Debtor and his co-conspirators knew that there were junior lienholders on the Countrywide Property, the Chase Property, and the WMC Property and knew that their participation in the conspiracy would cause injury to the Plaintiffs' rights. In fact, the conspiracy was carried out for the purpose of stripping the preexisting liens on the Countrywide Property, the Chase Property, and the WMC Property, and then absconding with the excess proceeds from the foreclosure sales. Therefore, the Court concludes that the Debtor acted with the subjective motive to cause harm to the Plaintiffs, or, at the very least, that harm was substantially certain to result from the Debtor's participation in the conspiracy. Therefore, the debts were incurred through willful and malicious injury, and are non-dischargeable pursuant to section 523(a)(6). And, because "the primary debt[s are] nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damage[s], including post-judgment interest, are likewise nondischargeable." *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996).

**V. CONCLUSION**

This Court has found that the Debtor participated in a conspiracy to deprive the Plaintiffs of their preexisting liens on the Countrywide Property, the Chase Property, and the WMC Property, and abscond with the proceeds from the foreclosure sales of these properties. As a result, the Debtor is liable to the Plaintiffs for violations of the TTLA, Chapter 12 of the Texas Civil Practice and Remedies Code, and the TUFTA. The Plaintiffs are entitled to actual and statutory damages, as well as court costs, attorneys' fees, prejudgment interest, and post-judgment interest to compensate for these violations.

Further, these debts are non-dischargeable pursuant to sections 523(a)(4) and (a)(6) of the Bankruptcy Code. Even though the Plaintiffs have not proven that the debts were incurred due

to embezzlement, they have succeeded in demonstrating, by a preponderance of the evidence, that the debts were incurred by larceny. Therefore, the debts are non-dischargeable pursuant to section 523(a)(4). Further, because the debts arose from willful and malicious injury to the Plaintiffs' property rights, they are non-dischargeable pursuant to section 523(a)(6).

Three separate judgments will be entered on the docket as soon as this Court, after holding a hearing, determines the reasonable amount of court costs and attorneys' fees that each of the Plaintiffs have incurred. These costs and fees will be incorporated into each of the three judgments, and these judgments will then be entered onto the docket.

Signed:   April 25, 2013

_____

Jeff Bohm
Chief United States Bankruptcy Judge